PER CURIAM.
|, We granted certiorari in this case to determine whether the bleachers in a high school stadium constituted an unreasonable risk of harm to plaintiff. For the reasons that follow, we conclude the district court properly held the bleachers do not present an unreasonable risk of harm under the facts of this case.
UNDERLYING FACTS
On October 29, 2004, plaintiff, Jeanine Pryor, attended a football game between Barbe High School and New Iberia High School to watch her grandson, who played on the Barbe High School team. The game was played at Lloyd G. Porter Stadium, a facility owned and maintained by the Iberia Parish School Board (“school board”), which served as the home stadium for New Iberia High School. At the time of the game, plaintiff was sixty-nine years old, and was recovering from hip surgery performed approximately one year earlier.[1]
Spectator seating is positioned on both the east and west sides of the football field. On the west side of the field, which is traditionally where the home team’s fans sit, the seating consists of uniform and symmetrical wood board seats with concrete |2risers. This facility sits well off the ground, and has entrance and exit ramps leading to the seats. The west side seating was also equipped with disability access ramps and handicap-accessible seating.
On the east side of the field, which is where the visiting team’s fans traditionally sit, there is a metal frame bleacher approximately fifteen feet high and two hundred fifty feet long. Spectators are seated on nine wood seat boards with nine wood foot boards. The bleachers have rails around the sides and rear, but do not have rails in the front, and do not have aisles to facilitate entrance or exit. The seat boards are uniform and symmetrical, with the exception of the space between the first and second seat boards, which are positioned approximately eighteen inches apart. All of the other seat boards are approximately eight inches apart in height.
When plaintiff and her family arrived at the stadium, they ascended the wooden bleachers on the east side of the stadium, or the visitors’ side. Plaintiff testified “the first seat board was unusually high,” and she could not step up the eighteen inches from the first row to the second, so she *596 grabbed the second board and lay on her side so she could swing one leg up at a time. She then stood up, and her daughter assisted her for the remainder of the way up the rows.
At halftime, plaintiff had to use the restroom, and she descended the bleachers with her daughter’s assistance. When they came to the eighteen-inch gap between the first and second row, instead of lying on her side and swinging her legs over the gap as she had done earlier, plaintiff attempted to simply step down. In the process, plaintiff fell and sustained injuries.
As a result of the accident, plaintiff filed suit against the school board, alleging the bleachers were defective. The matter proceeded to a bench trial before the district court. At the conclusion of trial, the district court rendered judgment in favor of the | .¡school board, dismissing plaintiffs suit with prejudice. In reasons for judgment, the district court determined that under a risk/utility analysis, the condition of the bleachers was not unreasonably dangerous.
Plaintiff appealed. The court of appeal reversed and rendered judgment in favor of plaintiff. Pryor v. Iberia Parish School Board., 2010-28 (La.App. 3 Cir. 6/16/10), 42 So.3d 1015. In rejecting the district court’s reasoning, the court of appeal found there was “no utility or social value in exposing visiting patrons to an eighteen-inch vertical differential between the seat boards in question.” 2010-23 at p. 6, 42 So.3d at 1020. The appellate court then rendered judgment apportioning 70% fault to the school board, and 30% fault to plaintiff. It awarded plaintiff damages in the amount of $530,745.79, consisting of $300,000 in general damages, and $230,745.79 in special damages.
Upon the school board’s application, we granted certiorari to consider the correctness of this ruling. Pryor v. Iberia Parish School Board, 2010-1683 (La.11/5/10), 50 So.3d 822. The narrow issue presented for our consideration is whether the bleachers are unreasonably dangerous.
DISCUSSION
The general rule is that the owner or custodian of property has a duty to keep the property in a reasonably safe condition. The owner or custodian must discover any unreasonably dangerous condition on the premises, and either correct the condition or warn potential victims of its existence. Smith v. The Runnels Schools, Inc., 04-1329 (La.App. 1 Cir. 3/24/05), 907 So.2d 109, 112. Nonetheless, we have recognized that defendants generally have no duty to protect against an open and obvious hazard. If the facts of a particular case show that the complained-of | condition should be obvious to all, the condition may not be unreasonably dangerous, and the defendant may owe no duty to the plaintiff. Eisenhardt v. Snook, 08-1287 (La.3/17/09), 8 So.3d 541; Dauzat v. Curnest Guillot Logging, Inc., 08-0528 (La.12/2/08), 995 So.2d 1184. It is the court’s obligation to decide which risks are unreasonable based upon the facts and circumstances of each case. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La.1984). The ultimate determination of unreasonable risk of harm is subject to review under the manifest error standard. Reed v. Wal-Mart, Inc., 97-1174 (La.3/4/98), 708 So.2d 362.
 In determining whethér a defect presents an unreasonable risk of harm, the trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair. Reed, 97-1174 at p. 5, 708 So.2d at 365; Boyle v. Board of Supervisors, 96- *597 1158 (La.1/14/97), 685 So.2d 1080, 1083; Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983); Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971). In determining whether a condition is unreasonably dangerous, courts have adopted a risk-utility balancing test. This test encompasses four factors: (1) the utility of the thing; (2) the likelihood and magnitude of harm, which includes the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiffs’ activities in terms of its social utility, or whether it is dangerous by nature. Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585, cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996).
For purposes of the first factor, it is undisputed that the bleachers serve a social utility purpose by providing seating for patrons of the stadium. However, in a brief to this court, plaintiff argues we should focus on the hazard which caused her injury|fi — the eighteen-inch gap between the first and second seat — which she claims provides no social utility.
Our jurisprudence has not been entirely consistent on this point. There is language in Reed suggesting the “trier of fact must decide whether the social value and utility of the hazard outweigh, and thus justify, its potential harm to others[.]” Reed, 97-1174 at p. 5, 708 So.2d at 365 (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 31 (5th ed.1984)). However, other decisions focused on the social utility of the thing as a whole, notwithstanding the presence of the defect. See Dauzat, 08-0528 at p. 5, 995 So.2d at 1187 (“it is undisputed that the logging road has a strong social utility for purposes of the first factor, as it is the only method for removing harvested timber from Lake Pearl’s land”); Boyle, 96-1158 at p. 6, 685 So.2d at 1083 (“[t]he utility of sidewalks on university campuses is clear as pointed out by the court of appeal.”); Pitre, 95-1466 at p. 12, 673 So.2d at 591 (“[w]e begin our analysis by examining the utility of the light pole”).
Moreover, we note the eighteen-inch gap between the first and second seat is not a defect in the bleachers per se, but simply part of their design. The evidence indicates the bleachers were installed in 1969 or 1970, before the adoption of any building or fire code regulations. No other accidents involving the bleachers were reported. The testimony of Robert Barras, a licensed architect who evaluated the bleachers, indicated they did not present an unreasonably dangerous condition with regard to entry or exit. Under these circumstances, we conclude the bleachers as a whole provide social utility.
The second factor focuses on the likelihood and magnitude of harm, which includes the obviousness and apparentness of the condition. With regard to this factor, the district court made a factual finding that plaintiff was aware of the gap | ^between the first and second seat board, yet chose to straddle the second seat board to ascend the bleachers. This factual determination is supported by evidence in the record, including plaintiffs own testimony that she realized the first seat board was “unusually high.”
The third factor focuses on the cost of preventing the harm. The record establishes the condition could have been corrected at the cost of approximately $1,500 to $2,000. On the other hand, the evidence also indicates plaintiff could have avoided the harm at no cost to her by choosing to sit on the west side of the stadium, where disability access ramps and handicap-accessible seating were provided.[2]
*598 Finally, we look to plaintiffs activities in terms of social utility, or whether the activities are dangerous by nature. Obviously, the act of attending a high school football game carries a social utility, and is not inherently dangerous. Nonetheless, as discussed above, plaintiffs decision to sit on the east side of the stadium rather than the west side of the stadium, where disability access ramps and handicap-accessible seating were provided, effectively increased the risk to her, given her physical impairment.
In summary, we conclude the district court’s factual determination that the bleachers were not unreasonably dangerous is not clearly wrong. Specifically, the evidence in the record supports the finding that the social utility of the bleachers outweighed any minimal risk posed by the eighteen-inch gap between the first and second seat boards. The evidence establishes plaintiff was aware of this open and obvious risk. She could have easily avoided any risk by using additional care (as she did when she first ascended the bleachers), or by choosing to sit on the west side of 17the stadium where suitable accommodations for persons with physical impairments were provided.
Accordingly, we find the court of appeal erred in reversing the district court’s judgment, and we now reinstate that judgment. Because of this conclusion, we pretermit any consideration of fault or damages.
DECREE
For the reasons assigned, the judgment of the court of appeal reversing the district court’s judgment is reversed. The district court’s judgment dismissing plaintiffs suit with prejudice is reinstated.
KIMBALL, C.J., concurs and assigns reasons.
JOHNSON, J., dissents.
KNOLL, J., dissents and assigns reasons.

. Plaintiff had a host of physical impairments prior to the accident. In 2000, she underwent ankle surgery, and lumbar surgery and a total left hip replacement in 2003. In February 2004, her doctor declared her to be mobility impaired. She walked with an abnormal gait, and used a cane.

. We acknowledge handicap-accessible seating was only available on the west side of the stadium, which was traditionally identified as the home-field side of the stadium. It would have been preferable if the stadium provided comparable handicap accommodations for visitors, such as plaintiff, who would logically seek seating on the east, or visiting team side of the stadium. Nonetheless, the fact remains that handicapped seating was available for plaintiff.