KNOLL, Justice.*
Bln this personal injury case, we must determine whether a one and one-half to three inch misalignment between the floors of an elevator and a building’s lobby created an unreasonable risk of harm as found by the jury, or whether the elevator’s defective condition presented an open and obvious hazard as determined by the Court of Appeal.
Plaintiff, Paul Broussard, filed this suit against the State of Louisiana (“the State”) for damages he sustained from an accident caused by the misaligned elevator. Upon conclusion of a three-day trial, a jury re *179 turned a verdict in Broussard’s favor, finding the offset between the elevator and lobby floors presented an unreasonable risk of harm. After reducing Broussard’s damages in proportion to his assigned percentage of fault, the District Court entered a judgment consistent with the jury verdict in the amount of $985,732.56. The First Circuit Court of Appeal held the jury’s factual determination that the elevator’s defective condition presented an unreasonable risk of harm was manifestly erroneous because the defect was open and obvious, and reversed. We granted Broussard’s writ to further examine, under the manifest error doctrine, whether a ladefective condition is more properly considered an open and obvious hazard where no duty is owed, rather than an unreasonably dangerous condition where comparative fault is applicable. Broussard v. State ex Rel. Office of State Bldgs., 12-1238 (La.10/26/12), 99 So.3d 50.
After reviewing the applicable law and the record in its entirety, we find the jury’s unreasonable risk of harm determination was not manifestly erroneous. The record contains a reasonable factual basis to support the jury’s finding the misaligned elevator created an unreasonable risk of harm to Broussard and the State breached its duty to maintain its property in a reasonably safe condition by failing to remedy this defect or warn of its existence. Accordingly, we reverse the Court of Appeal and reinstate in its entirety the judgment of the District Court rendered in conformity with the jury’s verdict.
FACTS AND PROCEDURAL HISTORY
The Wooddale Tower (“the Tower”) is a twelve-story, State-owned office building located in Baton Rouge. There are two elevators in the Tower’s lobby. Sometime in 1998, the State contracted to have the Tower’s roof repaired. This roofing project generated a large amount of dust and debris, which eventually settled and accumulated on the elevators’ relay contacts, causing the elevators to operate erratically for several years. Most significantly, the Tower’s elevators would often stop in a position uneven with floors of the building. These misalignments would create an offset between the elevator floor and the building floor ranging anywhere from a few inches to several feet.
Between 1999 and 2000, the State received multiple complaints from the Tower’s tenants expressing their concern the malfunctioning elevators would eventually cause a serious accident. For instance, several employees from the Department of Social Services, an agency housed on the Tower’s first floor, sent a memorandum to their supervisor on July 10, 2000, in which they detailed the | ¡¡elevators’ myriad problems. In their memo, the concerned tenants noted the elevators’ frequent failure to stop in a position flush with the building’s floors, stating this problem would often cause employees to trip when entering or exiting the elevators. The Department of Social Services employees also recalled incidents in which the elevators dropped anywhere from a few inches to several feet while employees were attempting to enter or exit them.[1] Although *180 the State planned to modernize the elevators and, in response to the reported problems, advanced the project’s start date from 2001 to 1999, it was unable to successfully bid out the repair contract until June 20, 2001, almost five months after Broussard’s accident.
On January 23, 2001, Broussard, a United Parcel Service (“UPS”) delivery driver, sustained a serious back injury while maneuvering a loaded dolly into one of the Tower’s misaligned elevators. Before this incident, Broussard worked for UPS eleven years, seven of which were as a delivery driver. During his tenure as a UPS driver, Broussard delivered parcels to the Tower on a daily basis. He was, therefore, familiar with the building and knew its elevators intermittently stopped at a level uneven with the building’s floors.
On the morning of the accident, Brous-sard arrived at the Tower and delivered several overnight packages. After delivering these priority items, he returned to his truck and loaded a standard-issue UPS dolly with six boxes of computer paper weighing approximately three hundred pounds. Broussard’s objective was to deliver this paper to the Tower’s eighth floor. He then entered the lobby with his delivery, where one of the elevators stood open with its floor 14elevated one and one-half to three inches above the lobby floor. Two individuals had entered the elevator before Broussard. One of them, Tammy Loupe, testified Broussard initially held the dolly in front of his body and attempted to push it onto the elevator. The offset between the elevator and lobby floors, however, impeded Broussard’s momentum and prevented him from pushing the dolly forward. After his initial maneuver failed, Broussard turned around, stepped backwards into the elevator, and attempted to pull the dolly over the elevation. Brous-sard successfully pulled the dolly over the offset, but the inertia created by the pull caused him to lose control of the load and forcefully pushed him into the back wall of the elevator. The resulting impact caused Broussard to suffer a serious back injury, and he was eventually diagnosed with an L5-S1 centrally herniated, degenerative disc.
After the accident Broussard was unable to return to work for UPS. Because his doctors prohibited him from lifting over 70 pounds, Broussard was forced to obtain less strenuous, but lower-paying, employment. At the beginning of trial in August 2010, he was employed as a delivery driver for a dry cleaner.
Broussard subsequently sued the State of Louisiana through the Office of State Buildings for the damages he suffered as a result of the accident.[2] In his petition, Broussard alleged the State was negligent in failing to properly maintain and adequately repair a defective thing within its custody and care, thereby creating an unreasonable risk of harm. The case proceeded to trial and was tried to a jury on August 23-26, 2010. At the conclusion of trial, the jury returned a verdict in favor of Broussard, specifically finding (1) the offset between the | ¡^elevator and lobby floors created an unreasonable risk of harm, (2) the State had a reasonable opportunity to remedy the defect but failed to do so, and *181 (3) the defect was the proximate cause of Broussard’s injuries. The jury then found Broussard 38% at fault in causing the accident and apportioned the remaining 62% to the State. Ultimately, the jury awarded Broussard $1,589,890.23 in damages. After reducing these damages in proportion to Broussard’s assigned percentage of fault, the District Court rendered a judgment consistent with the jury verdict in the amount of $985,732.56.
The Court of Appeal reversed, holding the jury’s determination the offset created an unreasonable risk of harm was manifestly erroneous. Broussard v. State ex. rel. Office of State Bldgs., 11-0479, p. 6 (La.App. 1 Cir. 3/30/12), 2012 WL 1079182 (unpublished). The Court of Appeal, applying the four-prong, risk-utility balancing test articulated by this Court in Pryor v. Iberia Parish School Board, 10-1683, p. 4 (La.3/15/11), 60 So.3d 594, 597 (per curiam), concluded the elevator’s social utility outweighed the risk created by its defective, yet readily apparent, condition. According to the Court of Appeal, a proper risk-utility balancing weighed against finding the offset created an unreasonable risk of harm. First, the Tower’s elevators serve an extremely useful, perhaps indispensable, societal function. Second, the defect was open and obvious and thus did not present a serious risk of harm; further, Broussard admitted he was probably aware of the offset when he pulled the dolly into the elevator. Third, Broussard could have avoided injuring himself by either dividing the boxes of paper into multiple, lighter loads or waiting for another elevator. Finally, there was no record of the elevator’s defective condition ever causing any injuries in the past. The Court of Appeal ultimately found no reasonable basis existed to support the jury’s verdict, concluding the jury was manifestly erroneous in finding an unreasonable risk of harm.
UWe note Judge Whipple concurred, writing separately to express her concern that denying a victim’s recovery based on whether a defective condition should be obvious to the victim runs “perilously close to resurrecting the doctrine of assumption of the risk.” Broussard, 11-0479 at p. 7 (Whipple, J., concurring). However, in lieu of this Court’s and the First Circuit’s recent jurisprudence focusing on the degree to which a dangerous condition should be observed by a potential victim, Judge Whipple felt compelled to concur in the result.[3] Id. at pp. 7-8 (citing Eisenhardt v. Snook, 08-1287, p. 7 (La.3/17/09), 8 So.3d 541, 544-45 (per curiam); Williams v. City of Baton Rouge, 02-0682, p. 5 (La.App. 1 Cir. 3/28/03), 844 So.2d 360, 366).
DISCUSSION
Broussard’s claims against the State are rooted in La. Civ.Code arts. 2317 and 2322. A public entity’s liability for a defective thing within its custody or care is ordinarily analyzed under La.Rev.Stat. § 9:2800(C). La.Rev.Stat. § 9:2800(A), however, exempts buildings from the scope of § 9:2800(C), stating “[a] public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody,” Therefore, § 9:2800(A) directs us to Article 2317 to determine a public entity’s liability for the damages caused by the condition of 'a building within its custody and care.
*182 In this case, the State is the owner of two defective elevators. These elevators, while not “buildings,” are, under Louisiana law, component parts of a building. We have previously stated that “necessary appurtenances to structures and movables made immovable by attachment, which are defective or have fallen into ruin, also may be included within that term ‘building’ for purposes of the building-owner’s delictual responsibility under Article 2322.” Olsen v. Shell Oil Co., 365 So.2d 1285, 1291 (La.1978). See also Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law § 14.06, pp. 14.16-14.17 (2004 ed. Supp. 2012). There is no set test for determining whether a thing attached to a building, such as an elevator, is part of the building for purposes of the building-owner’s delic-tual liability. Various courts, however, have found the following factors persuasive: (1) how securely the thing is attached to the building, see Olsen, 365 So.2d at 1291 (movable living quarters welded to an oil rig were an appurtenance of the rig); (2) the permanence of the attachment, see, e.g., Parker v. Boise Southern Co., 570 So.2d 6, 10 (La.App. 3 Cir.1990), unit denied, 575 So.2d 388 (La.1991) (transitorily attached panel and enclosure system not necessary appurtenance to or component part of a building); and (3) whether the attachment would be considered permanent under the Civil Code articles regulating property rights, Coulter v. Texaco, Inc., 117 F.3d 909, 914 (5th Cir.1997) (Civil Code articles defining component parts provide sole framework for determining whether an attachment to a building is part of that building for purposes of assessing liability under Article 2322). We find the elevators in this case are properly considered part of the Tower for purposes of the State’s liability under Article 2322, as they were permanently attached to the building and, under La. Civ.Code arts. 465 and 466, were its component parts. See La. Civ.Code art. 465 (“Things incorporated into ... a building, or other construction, so as to become an integral part of it, such as building materials, are its component parts.”); La. Civ.Code art. 466 (“Things that are attached to a building and that, according to prevailing usages, serve to complete a building of the same general type, without regard to its specific use, are its component parts.... ”).
Because these elevators are component parts of the Tower, Broussard’s claims are properly analyzed under La. Civ.Code art. 2317, as directed by La.Rev. Stat. § 9:2800(A). Article 2317 states “[w]e are responsible, not only for the | ^damage occasioned by our own act, but for that which is caused by ... the things we have in our custody.” La. Civ.Code art. 2322 specifically modifies liability under Article 2317 with respect to the owner of a ruinous building or a defective component part of that building. Article 2322 provides, in pertinent part:
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care....
Under Article 2322, a plaintiff must prove the following elements to hold the owner of a building liable for the damages caused by the building’s ruin or a defective component: (1) ownership of the building; (2) the owner knew or, in the exercise of reasonable care, should have known of the ruin or defect; (3) the damage could have been prevented by the *183 exercise of reasonable care; (4) the defendant failed to exercise such reasonable care; and (5) causation. La. Civ.Code art. 2322. Additionally, our jurisprudence requires that the ruinous building or its defective component part create an unreasonable risk of harm. Entrevia v. Hood, 427 So.2d 1146, 1148-49 (La.1983); Olsen, 365 So.2d at 1292.[4] The sole issue we must address here is whether the defect in the Tower’s elevators created an unreasonable risk of harm, thereby subjecting the State to liability under Article 2322.
 lgThe owner of a building is not responsible for all injuries resulting from any risk posed by the building. Entrevia, 427 So.2d at 1149. Rather, the owner is only responsible for those injuries caused by a ruinous condition or defective component part that presents an unreasonable risk of harm to others. Id. We have described the question of whether a defect presents an unreasonable risk of harm as “a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the facts.” Reed v. Wal-Mart Stores, Inc., 97-1174, p. 4 (La.3/4/98), 708 So.2d 362, 364 (quoting Tillman v. Johnson, 612 So.2d 70 (La.1993) (per curiam)).[5] As a mixed question of law and fact, it is the fact-fínder’s role — either the jury or the court in a bench trial — to determine whether a defect is unreasonably dangerous. Thus, whether a defect presents an unreasonable risk of harm is “a matter wed to the facts” and must be determined in light of facts and circumstances of each particular case. E.g., Du- *184 pree v. City of New Orleans, 99-3651, pp. 13-14 (La.8/31/00), 765 So.2d 1002, 1012 (citation omitted); Reed, 97-1174 at p. 4, 708 So.2d at 364.
To aid the trier-of-fact in making this unscientific, factual determination, this Court has adopted a risk-utility balancing test, wherein the fact-finder must balance the gravity and risk of harm against individual societal rights and obligations, the hnsocial utility of the thing, and the cost and feasibility of repair. See, e.g., Reed, 97-1174 at p. 5, 708 So.2d at 365; Boyle v. Board of Sup’rs, Louisiana State Univ., 96-1158 (La.1/14/97), 685 So.2d 1080, 1083; Entrevia, 427 So.2d at 1149. Specifically, we have synthesized this risk-utility balancing test to a consideration of four pertinent factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiffs activities in terms of its social utility or whether it is dangerous by nature. E.g., Dauzat v. Curnest Guillot Logging, Inc., 08-0528, p. 5 (La.12/2/08), 995 So.2d 1184, 1186-87 (per curiam); Hutchinson v. Knights of Columbus, Council No. 5717, 03-1533, pp. 9-10 (La.2/20/04), 866 So.2d 228, 235; Pitre v. Louisiana Tech. Univ., 95-1466, pp. 12-16 (La.5/10/96), 673 So.2d 585, 591-93.
The second prong of this risk-utility inquiry focuses on whether the dangerous or defective condition is obvious and apparent. Under Louisiana law, a defendant generally does not have a duty to protect against an open and obvious hazard. See, e.g., Hutchinson, 03-1533 at p. 9, 866 So.2d at 234. In order for a hazard to be considered open and obvious, this Court has consistently stated the hazard should be one that is open and obvious to all, ie., everyone who may potentially encounter it. E.g., Caserta v. Wal-Mart Stores, Inc., 12-0853, p. 1 (La.6/22/12), 90 So.3d 1042, 1043 (per curiam); Dauzat, 08-0528 at p. 3, 995 So.2d at 1186; Hutchinson, 03-1533 at p. 9, 866 So.2d at 234; Pitre, 95-1466 at p. 11, 673 So.2d at 591; Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1136 (La.1988) (“[A] potentially dangerous condition that should be obvious to all comers is not, in all instances, unreasonably dangerous.”). Although the “open and obvious” argument suggests a disguised application of contributory negligence or assumption of the risk, when the risk is open and obvious to everyone, the probability of injury is low and the thing’s utility may outweigh the risks caused by | nits defective condition. Maraist & Galligan, Louisiana Tort Law § 14.03, p. 14-9. See also Frank L. Maraist, H. Alston Johnson III, Thomas C. Galligan, Jr., & William R. Corbett, Answering a Fool According to His Folly: Ruminations on Comparative Fault Thirty Years On, 70 La. L.Rev. 1105, 1107 (2011) (“The [Cjourt, however, has recognized ... situations in which conduct falls within traditional assumption of the risk principles but does not overlap with conduct that customarily is considered contributory negligence ... [one of which is where] the victim voluntarily encounters a known risk that is ‘obvious to all comers,’ sometimes also referred to as ‘open and obvious risk.’”).
We have stated that if the facts and circumstances of a particular case show a dangerous condition should be open and obvious to all who encounter it, then the condition may not be unreasonably dangerous and the defendant may owe no duty to the plaintiff. E.g., Caserta, 12-0853 at p. 1, 90 So.3d at 1043; Dauzat, 08-0528 at p. 4, 995 So.2d at 1186; Hutchinson, 03-1533 at p. 9, 866 So.2d at 234; Pitre, 95-1466 at p. 7, 673 So.2d at 589; Socorro v. City of New Orleans, 579 So.2d 931, 942 (La.1991). While this statement is consistent with our *185 “open and obvious to all” doctrine, by tethering the existence of a duty to a determination of whether a risk is unreasonable, our prior decisions have admittedly conflated the duty and breach elements of our negligence analysis. See Maraist, et. al., Answering a Fool, 70 La. L.Rev. at 1121-22, 1124. This conflation, in turn, has confused the role of judge and jury in the unreasonable risk of harm inquiry and arguably transferred “the jury’s power to determine breach to the court to determine duty or no duty.” Id. at 1124, 1132-33.
In order to avoid further overlap between the jury’s role as fact-finder and the judge’s role as lawgiver, we find the analytic framework for evaluating an unreasonable risk of harm is properly classified as a determination of whether a defendant breached a duty owed, rather than a determination of whether a duty is | iaowed ab initio. It is axiomatic that the issue of whether a duty is owed is a question of law, and the issue of whether a defendant has breached a duty owed is a question of fact. E.g., Brewer v. J.B. Hunt Transp., Inc., 09-1408, p. 14 (La.3/16/10), 35 So.3d 230, 240 (citing Mundy v. Dep’t of Health and Human Res., 620 So.2d 811, 813 (La.1993)). The judge decides the former, and the fact-finder—judge or jury — decides the latter. “In the usual case where the duty owed depends upon the circumstances of the particular case, analysis of the defendant’s conduct should be done in terms of ‘no liability or ‘no breach of duty.’ ” Pitre, 95-1466 at p. 22, 673 So.2d at 596 (Lemmon, J., concurring). Because the determination of whether a defect is unreasonably dangerous necessarily involves a myriad of factual considerations, varying from case to case, Reed, 97-1174 at p. 4, 708 So.2d at 364, the cost-benefit analysis employed by the fact-finder in making this determination is more properly associated with the breach, rather than the duty, element of our duty-risk analysis.[6] See Maraist, et. al., Answering a Fool, 70 La. L.Rev. at 1120 (“[0]ne might persuasively argue that the cost-benefit analysis used to determine whether a risk is reasonable or unreasonable is the heart of the breach decision and is one that should be conducted by the fact-finder, rather than by the court....”). Thus, while a defendant only has a duty to protect against unreasonable risks that are not obvious or apparent, the fact-finder, employing a risk-utility balancing test, determines which risks are unreasonable and whether those risks pose an open and obvious hazard. In other words, the fact-finder | ^determines whether defendant has breached a duty to keep its property in a reasonably safe condition by failing to discover, obviate, or warn of a defect that presents an unreasonable risk of harm.
Because the determination of whether a defective thing presents an un *186 reasonable risk of harm “encompasses an abundance of factual findings, which differ greatly from ease to case, followed by an application of those facts to a less-than scientific standard, a reviewing court is in no better position to make the determination than the jury or trial court.” Reed, 97-1174 at p. 4, 708 So.2d at 364-65. Accordingly, the fact-finder’s unreasonable risk of harm determination is subject to the manifest error standard of review and should be afforded deference on appeal. Id. at 364-65. Under the manifest error standard of review, a court of appeal may not set aside a jury’s finding of fact unless it is manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The reviewing court must only decide whether the fact-finder’s conclusion was reasonable, not whether it was right or wrong. Stobart v. State through DOTD, 617 So.2d 880, 882 (La.1993). In order to reverse a jury’s factual finding as manifestly erroneous, an appellate court must find the record, when reviewed in its entirety, (1) contains no reasonable factual basis for the jury’s finding and (2) establishes the finding is clearly wrong. Id. The court of appeal must always be mindful that if the jury’s findings “are reasonable in light of the record reviewed in its entirety ... [it] may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Id. at 882-83; Rosell, 549 So.2d at 844.
Applying these precepts to the case sub judice, we conclude the record contains a reasonable factual basis to support the jury’s determination the offset presented an unreasonable risk of harm to Brous-sard. Moreover, the record supports a finding that the elevator’s defective condition was not an open and 114obvious hazard, as the defect was not readily apparent to all who encountered it. As can be seen from the following application of our risk-utility balancing test, the risk of harm created by the defect was significant when weighed against the elevators’ social utility and the cost of preventing the harm.

Utility of the Elevators

First, we address the utility of the Tower’s elevators. Broussard does not dispute the Tower’s elevators serve a valuable, perhaps indispensable, societal function. The Tower is a multi-story office building, housing numerous State agencies and approximately 250 State employees. It is necessary for this building to have elevators so these employees can get to and from their offices in an efficient manner and carry on the important business of our State’s government. These elevators, therefore, serve a valuable societal function by quickly shuttling State employees to and from their offices in a large, multistory office tower.

Likelihood and Magnitude of Harm: Open and Obvious

The elevators’ utility, however, must be balanced against the likelihood and magnitude of the harm presented by their defective condition, including whether the defect was open and obvious.
In this case, the State is postured as the owner of a malfunctioning elevator. Because a malfunctioning elevator can quickly become a dangerous instrumentality, Louisiana law places “a high degree of care” upon elevator owners analogous to the degree of care imposed upon common carriers. Rosell, 549 So.2d at 848 n. 3; Ross v. Sisters of Charity of Incarnate Word, 141 La. 601, 603, 75 So. 425 (1917). See also Campbell v. Otis Elevator Co., 808 F.2d 429, 433 (5th Cir.1987); Otis Elevator Co. v. Seale, 334 F.2d 928, 929 (5th Cir.1964). See generally 3 HARPER, James, and Gray on Torts § 16.4, p. 570 n. *187 14 (3d edg007).[7]15 Under this heightened standard of care, the owner of an elevator has a duty to protect individuals using its elevator from the attendant dangers associated with this mode of conveyance. See Ross, 141 La. at 603, 75 So. at 425. The owner of an elevator “is bound to do all that human care, vigilance, and foresight can reasonably suggest under the circumstances, and, in view of the character of the mode of conveyance ... to guard against accidents and injuries resulting [from the use of the elevator].” Id.
In light of this heightened standard, an elevator owner, like any property owner, would invariably be required to maintain its elevator in a reasonably safe condition. Cf. Pitre, 95-1466 at p. 9, 673 So.2d at 590; Socorro, 579 So.2d at 939; Entrevia, 427 So.2d at 1149. Included in the owner’s duty to keep its elevator in a reasonably safe condition are the related obligations to discover if the elevator is in an unreasonably dangerous condition and, if so, to either correct the condition or warn of its existence. Cf. Pitre, 95-1466 at p. 9, 673 So.2d at 590; Socorro, 579 So.2d at 939. Furthermore, an owner of an unreasonably dangerous thing has a duty to label or mark the thing so as to provide adequate and reasonable warning to individuals using or attempting to use the thing. Dupree, 99-3651 at p. 15, 765 So.2d at 1013.
The Tower’s malfunctioning elevators presented a significant and likely risk of harm. The State had a heightened degree of care precisely because these elevators were malfunctioning and had become dangerous instrumentalities. See Rosell, 549 So.2d at 848 n. 3. Indeed, the public does not ordinarily anticipate offsets between the floors of elevators and buildings — a point the State’s expert safety consultant, Michael Frenzel, conceded on cross examination. Thus, in this | ^regard, we are not addressing an ordinary trip-and-fall case, wherein we generally state pedestrians must exercise ordinary care, keeping in mind irregularities frequently exist in sidewalks. Chambers, 11-898 at p. 6, 85 So.3d at 598. We find the elevators’ frequent failure to stop at a level flush with the building’s floors presented a significant and likely risk of harm, which was further exacerbated by the fact pedestrians do not ordinarily anticipate irregularities, such as the offset in question, when entering and exiting elevators.
The Court of Appeal also found the lack of prior reported injuries persuasive in holding the offset did not present a significant risk of harm. While the absence of prior reported injuries may be one of many factors for the trier-of-fact to consider, it is not an absolute bar to recovery. Numerous appellate decisions have found an unreasonable risk of harm even where the plaintiffs injury was the first reported at a certain place. E.g., Lawrence v. City of Shreveport, 41,825, pp. 89 (La.App. 2 Cir. 1/31/07), 948 So.2d 1179, 118586, writ denied, 07-0441 (La.4/20/07), 954 So.2d 166; Buchignani v. Lafayette Ins. Co., 41,384, p. 10 (La.App. 2 Cir. 8/23/06), 938 So.2d 1198, 120405; Burdis v. Lafourche Parish Police Jury, 618 So.2d 971, 977 (La.App. 1 Cir.1993), writ denied, 620 So.2d 843 (La.1993). The record in this case contains significant evidence of prior reported incidents in which employees tripped and were nearly injured while *188 entering or exiting the Towers elevators. The jury could have reasonably concluded these near misses, coupled with the enhanced danger presented by a malfunctioning elevator, outweighed the lack of any prior reported injuries.
An elevator owner, being akin to a common carrier, does not, however, insure the safety of every individual who may happen to ride its elevator. Cf. Rodriguez v. New Orleans Pub. Serv., Inc., 400 So.2d 884, 886 (La.1981). If the elevator’s defective condition is open and obvious to all who encountered it, then the defect may not be unreasonably dangerous. The Court of Appeal reached this 117conclusion, finding the one and one-half to three inch offset was open and obvious. Broussard, 11-479 at p. 5. On this point, we find the Court of Appeal supplanted its own judgment for that of the jury. Contra Reed, 97-1174 at p. 4, 708 So.2d at 364-65. Instead, we find the record clearly supports a finding the offset was not, under our jurisprudence, an open and obvious defect.
To be sure, we have consistently echoed one central theme throughout our open and obvious jurisprudence: If the complained-of condition should be obvious to all, then it may not be unreasonably dangerous. E.g., Pitre, 95-1466 at p. 11, 673 So.2d at 591; Socorro, 579 So.2d at 942; Murray, 521 So.2d at 1136. Thus, in order to be open and obvious, the risk of harm should be apparent to all who encounter the dangerous condition. See, e.g., Pitre, 95-1466 at p. 11, 673 So.2d at 591-92 (light poles in the area where college students were sledding were visible to everyone and thus open and obvious); Oster v. Dep’t. of Tramp. & Dev., State of La., 582 So.2d 1285, 1288 (La.1991) (ditch on shoulder of road readily discernable from a considerable distance and thus not unreasonably dangerous). Our “open and obvious to all” principle is not a hollow maxim. Rather, it serves an invaluable function, preventing concepts such as assumption of the risk from infiltrating our jurisprudence. Over 25 years ago in Murray, we recognized that defining a defendant’s initial duty in terms of a plaintiffs, versus everyone’s, knowledge of a dangerous condition would preserve assumption of the risk as a defense and undermine Louisiana’s pure comparative fault regime:
If accepted, defendants’ argument would inject the assumption of risk doctrine into duty/risk analysis “through the back door.” By that, we mean that the argument attempts to define the defendant’s initial duty in terms of the plaintiffs actual knowledge, and thereby seeks to achieve the same result which would be reached if assumption of risk were retained as a defense, i.e., a total bar to the plaintiffs recovery. A defendant’s duty should not turn on a particular plaintiffs state of mind, but instead should be determined by the standard of care which the defendant owes to all potential plaintiffs.
11S521 So.2d at 1136. In contrast, the “open and obvious to all” rule is “sensible ... and does not undermine the comparative fault regime by allowing a plaintiffs negligence to operate as a bar to recovery in a case where the defendant’s conduct poses a risk of harm to the hypothetical blameless plaintiff.” Maraist, et. al., Answering a Fool, 70 La. L.Rev. at 1130. The open and obvious inquiry thus focuses on the global knowledge of everyone who encounters the defective thing or dangerous condition, not the victim’s actual or potentially ascertainable knowledge. Simply put, we would undermine our comparative fault principles if we allowed the fact-finder to characterize a risk as open and obvious based solely on the plaintiffs awareness of that risk. The plaintiffs knowledge or awareness of the risk creat *189 ed by the defendant’s conduct should not operate as a total bar to recovery in a case where the defendant would otherwise be liable to the plaintiff. Murray, 521 So.2d at 1134. Instead, comparative fault principles should apply, and the plaintiffs “awareness of the danger” is but one factor to consider when assigning fault to all responsible parties under La. Civ.Code art. 2323. Id. (citing Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985)).[8]
Lain this case, there was a reasonable basis upon which the jury could conclude the defect in the Tower’s elevators, while apparent to Broussard, was not “open and obvious to all.” There is no dispute that Broussard was aware of the offset after it impeded his initial attempt to push the dolly onto the elevator. Moreover, Tammy Loupe, the woman who entered the elevator before Broussard, testified she too was aware of the offset. The record, however, contains numerous exhibits highlight-mg instances of State employees either tripping or falling on the elevators after failing to notice they were misaligned. For example, Steve Bowers, a state loss prevention officer, sent a memorandum to his supervisor on October 13, 1999, wherein he reported a dramatic increase in complaints about the Tower’s elevators. In the memo, Bowers recalled an incident where a handicapped employee almost fell while exiting one of the elevators, which had stopped approximately a foot and a half above the building floor. The record also contains a letter dated February 2, 1999, from Richie Dorian, owner of the maintenance company serving the Tower’s elevators, to the State. In his letter, Dorian states his company received multiple reports of passengers tripping on the Tower’s misaligned elevators. Finally, the jury examined.the July 10, 2000 tenant memo, in which concerned employees from the Department of Social Services recalled numerous instances of employees tripping *190 while entering or exiting the misaligned elevators. As numerous individuals — including those most familiar with the elevators, i.e., State employees working at the Tower — failed to notice and tripped over the misaligned elevators, a fact-finder could reasonably infer the defect, while apparent to Broussard, was not open and obvious to all who encountered it.
The State relies heavily on several of this Court’s recent per curiam opinions. See Pryor, 10-138, 60 So.3d 594; Eisenhardt v. Snook, 08-1287 (La.3/17/09),20 8 So.3d 541 (per curiam); Dauzat, 08-0528, 995 So.2d 1184. It argues these cases support the position Broussard should not recover because his awareness of the offset made the defect an open and obvious danger. We disagree.
First, Pryor involved a set of metal-frame bleachers. 10-138 at p. 2, 60 So.3d 594, 595. The bleachers did not have stairs and contained nine wooden seat boards. The seat boards thus doubled as steps, and patrons would have to traverse these boards in order to ascend or descend the bleachers. The defective condition was an 18-inch gap between the first and second boards, and the plaintiff was injured while descending this gap. The majority and dissenting opinions agreed this defect was open and obvious. Pryor, 10-1638 at p. 6, 60 So.3d at 598; see also 10-1638 at p. 1, 60 So.3d at 599 (Knoll, J., dissenting). Specifically, the defect was open and obvious to all, as it would have been virtually impossible for someone to ascend or descend the bleachers without noticing the 18-inch gap. Thus, in this respect, Pryor does not alter our longstanding doctrine that the defect, to be open and obvious, must be “open and obvious to all.”
Dauzat, like Pryor, can also be reconciled with our “open and obvious to all” doctrine. In Dauzat, the plaintiff injured his back when he drove an 18-wheel logging truck over a hole in a logging road. 08-0528 at p. 2, 995 So.2d at 1185. Because the plaintiff was an experienced logging truck driver, he was aware of the poor conditions of logging roads in Louisiana, although he was not aware of this particular rut. Id. at p. 3, 1185-86. We held the pothole was an obvious danger and did not create a significant likelihood of harm. Id. at p. 6, 1187. While the Dauzat plaintiff may have been generally aware of defects on logging roads, his experience as a professional truck driver did not bestow him with a heightened awareness of these risks, as the generally poor conditions of logging roads are open |⅞1 and obvious not just to professional truck drivers, but to all who use such roads.[9] Indeed, logging roads are often dangerous slurries of mud, water, and potholes that can seriously injure an unwary traveler. See Smith v. State Through Dep’t of Pub. Safety, 620 So.2d 1172, 1191 (La.App. 1 Cir.1992) (motorist injured after running into a pothole on a flooded logging road); *191 Guice v. MFA Mut. Ins. Co., 395 So.2d 934, 935 (La.App. 2 Cir.1981) (man injured and seven-year-old son killed when their three-wheeler hit a hole in a logging road and flipped over). We acknowledged this reality in Dauzat, stating “the job of a logging truck driver is dangerous by nature, as such drivers frequently encounter poor road conditions.” 08-0528 at p. 5, 995 So.2d at 1187. Dauzat is, therefore, distinguishable from the instant case in two significant respects: (1) Unlike the offset in the Tower’s elevator, the poor conditions of logging roads are open and obvious to all who travel on them; and (2) as discussed infra, delivering office supplies, unlike driving a logging truck, is not an inherently dangerous activity.
Finally, in Eisenhardt, the plaintiffs live-in girlfriend spilled trash on the steps of the couple’s apartment. 08-1287 at p. 1, 8 So.3d at 542. The plaintiff then slipped on the slimly residue from the trash and injured his back. We found this hazard was not unreasonably dangerous because the condition of the steps should have been open and obvious to the plaintiff. Id. at p. 6, 8 So.3d at .545. Unlike the instant case, Eisenhardt involved a. set of stairs that allegedly presented an unreasonable risk qf harm. Although the complained-of condition in Eisenhardt | ¡^was not a defective variation in the stairs, it is sufficiently analogous to such variations that the following principles . are applicable. Like sidewalks, every minor irregularity in a staircase does not necessarily pose an unreasonable risk of harm. See Koppie v. Comm. Union Ins. Co., 478 So.2d 179, 181 (La.App. 3 Cir.1985), writ denied, 478 So.2d 179 (La.1985) (citations omitted) (“A finding for the plaintiff herein would mean that any time there is a fall on stairs which can be found to have any measurable variation in riser heights or a measurable tread slant ... liability is mandated ... [I]t is doubtful that any steps, old or new, are so perfectly constructed that minor imperfections cannot be found.”). If we defined every imperfection in a staircase as unreasonably dangerous, we would effectively make owners the de facto insurers of everyone who happens to use then-stairs. See Hill v. Lundin & Assoc., Inc., 260 La. 542, 548, 256 So.2d 620, 622 (1972) (defendant not insurer against every risk of harm associated with its property). Ei-senhardt, therefore, can simply be read as an attempt to avoid sanctioning this undesirable result.
Admittedly, it appears our recent per curiam opinions have produced a patchwork of inconsistent jurisprudence. However, we emphasize again that each case involving an unreasonable risk of harm analysis must be judged under its own unique set of facts and circumstances. See, e.g., Dupree, 99-3651 at pp. 13-14, 765 So.2d at 1012; Reed, 708 So.2d at 364-65. There is no bright-line rule. The fact-intensive nature of our risk-utility analysis will inevitably lead to divergent results. Moreover, each defect is equally unique, requiring the fact-finder to place more or less weight on different considerations depending on the specific defect under consideration. What may compel a trier-of-fact to determine one defect does not present an unreasonable risk of harm may carry little weight in the trier-of-fact’s consideration of another defect. For instance, a fact-finder analyzing a defective sidewalk may find the cost and feasibility of repair to the city or municipality | ^outweighs all other considerations. See, e.g., Chambers, 11-898 at pp. 9-10, 85 So.3d at 600; Reed, 708 So.2d at 366. In contrast, the inherently dangerous nature of the plaintiff’s activity may persuade the trier-of-fact to conclude a defective logging road, for example, is not unreasonably dangerous. And here, a defective component part may lead the fact-finder to employ a different *192 weighing and balancing of the unreasonable risk of harm criteria. In short, while the unreasonable risk of harm calculus will remain amorphous, one variable must remain constant: In order for a defect to be considered open and obvious, the danger created by that defect must be apparent to all comers.

Cost of Preventing Harm

The third prong of our risk-utility balancing test requires the fact-finder to balance the risk of harm against the cost and feasibility of repair. See Reed, 97-1174 at p. 5, 708 So.2d at 365. The State set a $275,000 budget for the contract to modernize the Tower’s elevators. While certainly not inexpensive, the price of modernization, when weighed against the gravity of harm created by a malfunctioning elevator, was not inordinate or cost-prohibitive. Compare with Chambers, 11-898 at pp. 9-10, 85 So.3d at 600 (cost of repairing every minor sidewalk deviation substantial); Reed, 97-1174 at p. 7, 708 So.2d at 366 (substantial cost of repairing every minor deviation in concrete parking lot prohibitive); Boyle, 685 So.2d at 1083 (not feasible to repair every minor deviation in 22-plus miles of sidewalk on LSU’s campus). We understand and appreciate the State was making every effort to expedite the modernization process. In November 1999, the State initiated the project by commissioning specifications and outlining a preliminary budget. The State, responding to frequent complaints about the elevators, advanced the project’s initial start date from 2001 to 1999. Given the project’s cost, the State was also required by law to publicly bid out the contract. See La.Rev.Stat. § 38:2212. Due to overbidding and 124a bidder irregularity, the State was forced to conduct three separate bids and was unable to award the contract until June 20, 2001, approximately five months after Broussard’s accident.
While the State’s hands were tied during the bidding process, there were other inexpensive, interim steps it could have taken to warn employees and visitors of the hazard posed by the Tower’s elevators. Again, the owner of an elevator, like any property owner, has a duty to discover if its elevator is in an unreasonably dangerous condition and, if so, to either correct such condition or warn of its existence. Cf Pitre, 95-1466 at p. 9, 673 So.2d at 590; Socorro, 579 So.2d at 939. Although the State was limited in its ability to correct the elevators’ condition, it certainly could have warned employees and visitors until the condition could be corrected by placing visible signs at or near the elevators’ entrances. Broussard testified that on the day of the accident he saw no signs indicating the elevators were malfunctioning. Ms. Loupe testified “watch your step” signs were posted inside and outside the elevators, but she candidly admitted she could not say for certain whether such signs were posted on the day of the accident. Finally, Paula Saltaformaggio, a Department of Social Services employee, testified that although she was not around the elevators very often, she could not recall any signs warning of the elevators’ condition. Based on this evidence, the jury could reasonably infer there were no warning signs posted on the day of the accident. Thus, it appears the State failed to take the relatively inexpensive precaution of providing adequate warning to individuals using or attempting to use the Tower’s malfunctioning elevators. See Dupree, 99-3651 at p. 15, 765 So.2d at 1013.

Nature of Plaintiff’s Activity

Finally, the fact-finder must analyze the nature of the plaintiffs activity in terms of its social utility or whether it is dangerous by nature. Pitre, 95-1466 at p. 16, 673 So.2d at 593. As the Court of
*193 Appeal correctly noted, the activity | ¡^Broussard was engaged in, delivering office supplies, is highly useful to society. Just as an office building cannot function effectively without elevators, it is equally unlikely it could function in our modern business world without high-speed delivery companies such as UPS and its competitors.
The State argues Broussard’s act of pulling the dolly over the offset was inherently dangerous. We find there is a reasonable basis in the record upon which the jury could reach the opposite conclusion. First, Broussard testified he encountered and successfully maneuvered his dolly over offsets and curbs on a daily basis, suggesting it was not unreasonable for him to believe he could maneuver his dolly over the minor offset between the elevator and lobby floors. Second, the dolly was not overloaded, as it had a capacity of 500 lbs. and was loaded with only 300 lbs. Finally, the testimony of Pranhngar Draper, which the State relied upon during oral argument, was at best equivocal. Draper’s testimony does not, as the State suggests, lead to the necessary inference that pulling a loaded dolly into an elevator was contrary to Broussard’s training. Draper, a retired UPS risk management supervisor, stated on cross examination, “there’s no reason why it [the dolly] should be pulled into an elevator.” Draper, however, only made this statement after twice making the contradictory statement there were situations in which it would be acceptable for a UPS driver to pull a loaded dolly into an elevator.
Draper further testified UPS encourages delivery drivers to overcome obstacles in field and to do whatever is necessary to get the job done. Thus, according to Draper, UPS tacitly promoted self-reliance and a “can do it” mentality among its drivers. In light of this testimony, the suggestion Broussard should have waited for another elevator or divided his load into multiple, lighter deliveries seems unreasonable and, to Broussard, counterin-tuitive. In any event, considerations such as “the extent of the risk created by the [actor’s] conduct” and |2r,“extenuating circumstances which might require the actor to proceed in haste” are more appropriate considerations for the fact-finder when apportioning fault among all responsible parties. See LeBlanc v. Stevenson, 00-0157, p. 5 (La.10/17/00), 770 So.2d 766, 771 (citing Watson, 469 So.2d at 974).
In sum, we find the District Court properly instructed the jury to balance the gravity and risk of harm created by the offset against the elevators’ social utility, as well as the cost and feasibility of repair. Our review of the record in its entirety reveals this balancing weighs in favor of finding the offset presented an unreasonable risk of harm. Under this risk-utility balancing, the elevator’s defective condition was not open and obvious to all, and thus the risk of harm created by this condition was significant in comparison to the elevators’ social utility and the relatively low cost to the State of preventing the harm. In light of these findings, we conclude the Court of Appeal fell into error by substituting its own judgment of whether the defect presented an unreasonable risk of harm for that of the jury. Under our manifest error review, we find the record clearly supports a reasonable basis for the jury’s findings.
CONCLUSION
After considering the record in its entirety under the manifest error doctrine, we hold a reasonable basis exists to support the jury’s factual determination that a one and one-half to three inch offset between the floor of the elevator and the floor of the Tower’s lobby presented an *194 unreasonable risk of harm. We further find a reasonable factual basis exists to support a finding the elevator’s defective condition was not an open and obvious hazard, as the defect was not readily apparent to all who encountered it. The State, therefore, breached its duty of care by failing to remedy the defect or warn of its existence until the defect could be remedied. Accordingly, we reverse the judgment of the Court of Appeal and reinstate the judgment of the District Court rendered in conformity with the jury’s 127verdict.
DECREE
For the foregoing reasons, we hereby render judgment reversing the judgment of the Court of Appeal. The District Court’s judgment entered in conformity with the jury’s verdict is hereby reinstated in its entirety.
REVERSED AND RENDERED; DISTRICT COURT JUDGMENT REINSTATED IN ITS ENTIRETY.
Judge JEFFERSON D. HUGHES III was assigned as Justice pro tempore sitting for KIMBALL, C.J., for oral argument. He now sits as an elected Associate Justice at the time this opinion in rendered.
VICTORY, Justice, dissents and assigns reasons.
GUIDRY, Justice, dissents and assigns reasons.

 Judge Jefferson D. Hughes III was assigned as Justice pro tempore sitting for Kimball, C.J. for oral argument. He now sits as an elected Associate Justice at the time this opinion is rendered.

. The elevators' failure to stop flush with the Tower’s floors was not their only malady. The Department of Social Services employees recounted other instances where the elevators stopped on the wrong floors or “locked up” with passengers still on board. The employees recalled two separate occasions where other employees were forced to manually open one of the elevator’s doors and then jump down four feet to exit the car after the elevator became stuck between floors. Finally, a woman was trapped on one of the elevators as it ascended and descended the Tower’s twelve stories several times without stopping.

. In his initial petition, Broussard named only the State as a defendant. After uncovering other potentially liable parties through discovery, Broussard amended his petition twice to name the State's elevator inspection contractor, Elevator Technical Services, Inc. (ETS), and the State’s elevator maintenance contractor, Stratos Elevator, Inc., as defendants. However, these defendants were dismissed from the litigation prior to trial. The District Court dismissed ETS after ETS filed and successfully argued a peremptory exception of prescription, and Stratos was dismissed pursuant to a joint motion to dismiss.

. While this opinion does not contain a bright-line rule because the issue has to be examined on a case-by-case, fact-driven inquiry, our treatment infra does offer some guidance to our lower courts in addressing this difficult area.

. In brief and oral argument, the State argues its potential liability should be analyzed under La.Rev.Stat. § 9:2800(C). We note the elements of a claim under § 9:2800(C) closely parallel the elements of a claim under Article 2322. In order to hold a public entity liable under § 9:2800(C), a plaintiff must prove the following: (1) custody or ownership of the defective thing by the public entity, i.e., garde; (2) the defect created an unreasonable risk of harm; (3) the public entity had actual or constructive knowledge of the defect; (4) the public entity failed to take corrective action within a reasonable time; and (5) causation. Chambers v. Vill. of Moreauville, 11-898, p. 5 (La. 1/24/12), 85 So.3d 593, 597; Dupree v. City of New Orleans, 99-3651, p. 6 (La.8/31/00), 765 So.2d 1002, 1008 n. 6. Our analysis would, therefore, be substantially the same, regardless of whether we apply Article 2322 or § 9:2800(C). The sole, dispositive issue we must address is whether the elevators’ defective condition presented an unreasonable risk of harm — an issue we would analyze in the same manner under both provisions.

. We have also made the seemingly contradictory statement that ”[i]t is the court’s obligation to decide which risks are unreasonable based on the facts and circumstances of each case.” Pryor, 10-1683 at p. 4, 60 So.3d at 596; Pitre v. Louisiana Tech. Univ., 95-1466, p. 9 (La.5/10/96), 673 So.2d 585, 590; Socorro v. City of New Orleans, 579 So.2d 931, 940 (La. 1991). However, Pryor and Socorro involved bench trials. 10-1683 at p. 2, 60 So.3d at 596, 579 So.2d at 934. As such, "the court,” acting as trier-of-fact, was responsible for making the factual determination of whether the defects in Pryor and Socorro presented an unreasonable risk of harm. Likewise, Pitre was decided on a motion for summary judgment filed by the defendants. 95-1466 at p. 5, 673 So.2d at 588. In this procedural posture, it was the court’s obligation in Pitre to decide if there was a genuine issue of material fact as to whether concrete light poles at the base of a hill created an unreasonable risk of harm to college students sledding down that hill.
Additionally, our courts of appeal have followed Reed and Tillman, characterizing the unreasonable risk harm inquiry as a mixed question of law and fact. See, e.g., Jeansonne v. South Cent. Bell Tel. Co., 08-568, p. 10 (La.App. 5 Cir. 1/13/09), 8 So.3d 613, 620; Wiley v. Sanders, 34,923,. p. 7 (La.App. 2 Cir. 8/22/01), 796 So.2d 51, 56, writ denied, 01-2661 (La. 1/11/02), 807 So.2d 235; Roberts v. State, 00-778, p. 7 (La.App. 3 Cir. 11/2/00), 776 So.2d 519, 524, writ denied, 00-3307 (La.2/2/01), 784 So.2d 8; Small v. Baloise Ins. Co. of Am., 96-2484, p. 9 (La.App. 4 Cir. 3/18/98), 753 So.2d 234, 241, writ denied, 98-1345 (La.7/2/98), 724 So.2d 733.

. In cases addressing the State’s liability for unreasonably dangerous conditions on public roadways, we have stated that the determination of whether a defect presents an unreasonable risk of harm is analogous to the breach element of our duty-risk analysis. E.g., Brooks v. State ex. rel. Dep't of Transp. and Dev., 10-1908, p. 4 (La.7/1/11), 74 So.3d 187, 190 (“Whether the DOTD breached its duty, that is, whether the shoulder was in an unreasonably dangerous condition, is a question of fact and will depend on the facts and circumstances of each case.”); Fontenot v. Patterson Ins., 09-669, pp. 15-16 (La. 10/20/09), 23 So.3d 259, 271 (same). Louisiana appellate courts have also made this comparison. See Odom v. State, Dep’t of Transp. & Dev., 95-1605, p. 4 (La.App. 3 Cir. 9/25/96), 688 So.2d 1082, 1085, writ denied, 96-2574 (La. 1/24/97), 686 So.2d 858 ("In determining whether liability exists ... the plaintiff has the burden of proving ... the property was defective because it had a condition that created an unreasonable risk of harm (breach of the duty).”)

. We have described a common carrier’s heightened standard of care as: "The duty owed by a common carrier in Louisiana to its passengers is stringent, whether it be termed 'the highest standard of care,’ 'highest degree of vigilance, care and precaution for the safety of those it undertakes to transport,’ or ‘the strictest diligence.’ ” Green v. TACA Intern. Airlines, 304 So.2d 357, 359-60 (La.1974) (citations omitted).

. Our "open and obvious to all” rule is also mandated by the policy of legislative supremacy. In 1979, the Legislature adopted a pure comparative fault regime, which became effective in 1980, and in 1996, it modified this regime by extending comparative fault principles to virtually all negligent parties. See La. Civ.Code. art. 2323; Acts 1996, 1st Ex.Sess., No. 3, § 1; Acts 1979, No. 431, § 1. As a civil law jurisdiction, we must give deference to the acts and policy choices of the Legislature. See La. Civ.Code arts. 1 and 2 ("The sources of law are legislation and custom," and "[(legislation is a solemn expression of legislative will.”). See also Soloco, Inc. v. Dupree, 97-1256 (La. 1/21/98), 707 So.2d 12, 16 ("It is not the prerogative of the judiciary to disregard public policy decisions underlying legislation or to reweigh balances of interests and policy considerations already struck by the legislature.”). "Thus, any rule or system of rules that tends to undermine comparative fault principles to either allow the ... [negligent] plaintiff to recover 100% ... or allow the faulty defendant to escape liability must be viewed with some skepticism and, if allowed to exist at all, must be kept in relative check.” Maraist, et. al., Answering a Fool, 70 La. L.Rev. at 1132. Again, the “open and obvious to all” doctrine keeps principles such as assumption of the risk and contributory negligence "in relative check.”
Notably, the phrase "unreasonable risk of harm” is not used in any of the statutes governing premises liability or governmental entity liability. See La. Civ.Code arts. 2317, 2317.1, & 2322 and La.Rev.Stat. § 9:2800. However, Louisiana courts have consistently applied this test in premises liability cases for over 35 years, and the doctrine has attained the status of jurisprudence constante. See, e.g., Dupree, 99-3651 at p. 5, 765 So.2d at 1008; Jones v. Hawkins, 98-1259 (La.3/19/99), 731 So.2d 216, 218; Oster, 582 So.2d at 1288; Landry v. State, 495 So.2d 1284, 1287 (La.1986); Loescher v. Parr, 324 So.2d 441, 446 (La.1975). The phrase "open and obvious” is also notably absent from any of the premises liability statutes. The'se concepts — embodied in our risk-utility analysis— are thus strictly jurisprudential doctrines and cannot undermine or trump the Legislature's will in enacting a pure comparative fault regime.

. Professor Maraist opines that Dauzat potentially creates a professional exception to the "open and obvious to all” rule. Maraist, et. al., Answering a Fool, 70 La. L.Rev. at 1127, 1130. In his view, Dauzat arguably stands for the proposition that if the plaintiff is a member of a class of people who, because of their profession or experience, have knowledge of a risk that should be open and obvious to all members of the class, then the defendant may owe no duty to the members of that class "because of the obviousness of the risk vis-a-vis the group.” Id. Although Professor Maraist's exegesis is a cogent attempt to reconcile Dauzat in light of our sometimes divergent open and obvious case law, we decline to adopt this "open and obvious to all (members of a class)” principle. We find that doing so would implicitly sanction what we fervently cautioned against in Murray, i.e., reintroducing "through the back door” the subjective knowledge of the plaintiff and his or her assumption of the risk based on that knowledge. 521 So.2d at 1136.