STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-640


KELLI FUSELIER

VERSUS

CITY OF OAKDALE


********


APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-2007-371
HONORABLE PATRICIA C. COLE, DISTRICT JUDGE


**********


ULYSSES GENE THIBODEAUX
CHIEF JUDGE


**********


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and J. David Painter, Judges.


**AFFIRMED.**

Jerry Joseph Falgoust
Falgoust, Caviness & Bienvenu, LLP
P. O. Box 1450
Opelousas, LA 70571-1450
Telephone: (337) 942-5812
COUNSEL FOR:
    Defendant/Appellee - City of Oakdale

Roy Seale Halcomb, Jr.
Broussard, Halcomb & Vizzier
P. O. Box 1311
Alexandria, LA 71309-1311
Telephone: (318) 487-4589
COUNSEL FOR:
    Plaintiff/Appellant - Kelli Fuselier

**THIBODEAUX, Chief Judge.**

The plaintiff, Kelli Fuselier, was injured in a one-car accident when she ran off the roadway into a ditch on Hospital Drive in Oakdale, Louisiana. She appeals the judgment of the trial court in favor of the defendant, the City of Oakdale. The trial court found that Ms. Fuselier failed to prove that the conditions of the roadway created an unreasonable risk of harm that caused Ms. Fuselier's accident and injuries. For the following reasons, we affirm the judgment of the trial court.

I.

**ISSUES**

We must decide:

(1)     whether the trial court manifestly erred in finding that the conditions of Hospital Drive did not create an unreasonable risk of harm; and

(2)     whether the trial court manifestly erred in finding that the conditions of Hospital Drive did not cause the plaintiff's injuries.

II.

**FACTS AND PROCEDURAL HISTORY**

In August 2006, twenty-five-year-old Kelli Fuselier was driving south on Hospital Drive in the City of Oakdale (City) in a well-travelled, commercial area containing medical and health facilities and business offices. A vehicle allegedly entered the two-lane street from a parking lot on Ms. Fuselier's left and made a wide right turn, coming toward Ms. Fuselier and into her lane of travel. Ms. Fuselier moved to her right to avoid a collision. At the accident site, Hospital

Drive had no center striping, no shoulder, and there was a shallow ditch running parallel to Ms. Fuselier's lane of travel. The two right wheels of the Fuselier vehicle dropped onto the slope of the ditch while the two left wheels stayed on the pavement.

As Ms. Fuselier continued moving forward, the undercarriage of the vehicle scraped along the edge of the paved lane. Tire tracks in the grassy slope indicated that Ms. Fusilier's vehicle followed the contours of the ditch and was ultimately channeled toward a protruding culvert and another open ditch which ran perpendicular to the first. There was no evidence that Ms. Fuselier applied her brakes or tried to re-enter the roadway, but she may have taken her foot off of the accelerator. She struck the culvert, jumped the perpendicular cross ditch, and finally came to rest in the grass at the edge of the cement curb of the Allen Parish Health Unit's paved drive-way. At some point, her airbags deployed. There were apparently no witnesses to the accident, and the unknown car and driver that caused Ms. Fuselier to swerve toward the ditch were never identified.

Ms. Fuselier was taken by ambulance stretcher to the emergency room at the Oakdale Community Hospital where x-rays revealed a vertebral fracture at T-11. She was given the anti-inflammatory, Toradol, and was transferred to Christus St. Frances Cabrini Hospital in Alexandria. There, a CT scan revealed a mild, superior end plate compression fracture involving T-11. Though she complained of low back pain as well, there was no evidence of acute trauma involving the lumbar spine. Ms. Fuselier was discharged the same day with a prescription of Vicodin and was to follow up at the Oakdale Orthopedic Clinic, which she did not do. She did not see an orthopedic specialist or any doctor for the subject accident until August 2007, a full year after the accident.

2

Ms. Fuselier was unable to return to work for approximately two months after the accident. She brought suit against the City and its insurer for damages, and she sought medical treatment sporadically thereafter.

The case was tried as a two-day bench trial almost seven years after the accident. The trial judge found that the roadside conditions complained of were not unreasonably dangerous and found, in the alternative, that the unknown driver, not the condition of the road, was the cause-in-fact of the accident. Having found no liability against the City, the court did not reach the issues of apportionment of fault or extent of damages.

III.

## STANDARD OF REVIEW

The finding of the jury or trial judge on the ultimate determination of unreasonable risk of harm is subject to the manifest error standard of review. The fact finder's determination is accorded deference and may not be disturbed absent a finding that the determination was clearly wrong or manifestly erroneous. *Reed v. Wal-Mart Stores, Inc.*, 97-1174 (La. 3/4/98), 708 So.2d 362. Under this standard, if two reasonable and permissible views of the evidence exist, and the fact finder's choice is based on reasonable credibility evaluations and factual inferences in light of the entire record, the appellate court cannot reverse even if it would have, as trier of fact, weighed the evidence differently and reached a different result. *Stobart v. State, DOTD*, 617 So.2d 880 (La.1993).

3

IV.

## <u>LAW AND DISCUSSION</u>

To prevail in her suit against the City, Ms. Fuselier must prove that (1) the thing which caused the damage was in the custody of the City, pursuant to La.Civ.Code art. 2317; (2) the thing contained a defect because it had a condition that created an unreasonable risk of harm to Ms. Fuselier; (3) the defective condition of the thing caused Ms. Fuselier's injuries; and (4) pursuant to La.R.S. 9:2800, the City had actual or constructive notice of the defect and reasonable opportunity to remedy it prior to the accident, but failed to do so. *See Oster v. DOTD, State of La.*, 582 So.2d 1285 (La.1991).

Here, elements one and four are undisputed; i.e., the City had custody of Hospital Drive and an approximate twenty-foot right-of-way on either side; and the City knew that the roadway at the accident site had no center striping, no shoulder, and open ditches with steep slopes. As to elements two and three, the trial court found that Ms. Fuselier did not prove that the road conditions posed an unreasonable risk of harm, and in the alternative did not prove that the road conditions caused the accident and injuries.

The "duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder." *Brown v. Louisiana Indem. Co.*, 97-1344, p. 4 (La. 3/4/98), 707 So.2d 1240, 1242. "[M]any Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences, and other objects." *Myers v. State Farm Mut. Auto. Ins. Co.*, 493 So.2d 1170, 1173 (La.1986). "The finding of the existence of a defect alone is not a sufficient analysis to establish liability." *Boyle v. Board of Sup'rs, La. State*

4

*Univ.*, 96-1158, p. 5 (La. 1/14/97), 685 So.2d 1080, 1083. In order for there to be liability, the defect must create an unreasonably dangerous risk. *Id.* Whether a road condition is unreasonably dangerous is a question of fact. *Cormier v. Comeaux*, 98-2378 (La. 7/7/99), 748 So.2d 1123; *Ledoux v. State Through DOTD*, 98-24 (La. 9/18/98), 719 So.2d 43. In determining what is reasonable and unreasonable, the courts employ a risk-utility test. *Cormier*, 748 So.2d 1123.

In *Broussard v. State ex rel. Office of State Bldgs.*, 12-1238 (La. 4/5/13), 113 So.3d 175, the Louisiana Supreme Court emphasized the fact-intensiveness of the risk-utility test and its purpose:

> We have described the question of whether a defect presents an unreasonable risk of harm as "a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the facts." As a mixed question of law and fact, it is the fact-finder's role--either the jury or the court in a bench trial--to determine whether a defect is unreasonably dangerous. Thus, whether a defect presents an unreasonable risk of harm is "a matter wed to the facts" and must be determined in light of facts and circumstances of each particular case.
>
> To aid the trier-of-fact in making this unscientific, factual determination, this Court has adopted a risk-utility balancing test, wherein the fact-finder must balance the gravity and risk of harm against individual societal rights and obligations, the social utility of the thing, and the cost and feasibility of repair. Specifically, we have synthesized this risk-utility balancing test to a consideration of four pertinent factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature.

*Broussard*, 113 So.3d at 183-84 (citations omitted) (footnote omitted).

> As part of the cost analysis, the physical and financial inability of a municipality to maintain its things in anything more than a reasonably safe condition has

5

been considered by this Court as a factor in determining whether such condition creates an unreasonable risk of harm. *Brooks v. State ex rel. Dept. of Transp. and Development*, 10-1908 (La. 7/1/11), 74 So.3d 187[.] This includes not only the cost to fix the instant deviation, but also all similar deviations. *Boyle*, [685 So.2d] at 1083.

*Chambers v. Village of Moreauville*, 11-898, p. 9 (La. 1/24/12), 85 So.3d 593, 600.

As the Louisiana Supreme Court stated in *Graves v. Page*, 96-2201 (La. 11/7/97), 703 So.2d 566, one cannot be protected from all risks, and economic realities make zero accidents an impossible goal. The standard then for public entities is not perfection but rather that the roads be kept "'reasonably safe for persons exercising ordinary care and reasonable prudence.'" *Cormier,* 748 So.2d at 1131 (quoting *Brown*, 707 So.2d at 1242). The duty to maintain roads and rights of way does not require bringing old highways up to modern standards "unless a new construction or a major reconstruction of the highway has taken place." *Id.* at 1129 (citing *Ledoux,* 719 So.2d 43). Generally, in the numerous cases against DOTD, "where no road defect caused the driver to leave the road and the driver hit an object in the DOTD's right of way, the DOTD has been relieved of liability." *Id.* at 1129-30 (footnote omitted).

For example, in *Myers*, 493 So.2d 1170, the subject highway was built in the 1930s. Its lanes were subsequently widened leaving a narrowed shoulder and an adjacent ditch with a steep slope. The plaintiff swerved off the road to avoid a car and ran into a tree in the ditch. The court found the road's surface conditions good and found no breach of duty by the DOTD in failing to bring the road up to current standards. Likewise, in *Holloway v. State Through DOTD*, 555 So.2d 1341 (La.1990), the driver left the pavement and ran into a tree on the other side of the ditch. The court found that the roadway was unobstructed with a

6

clearly visible shoulder sloping into a shallow ditch. In both cases, the court found no unreasonably dangerous conditions, in spite of shoulder and ditch issues, and found no duty to bring the road up to current standards. A similar result was reached in *Cormier* which involved a ditch over six feet deep.

Here, the record reveals that, under *Broussard:* (1) The utility of Hospital Drive, which provided access to medical facilities, was high, as was the utility of its ditches, which provided drainage for Oakdale's flat terrain to prevent flooding in the City; however, the (2) likelihood of harm was low because there was no evidence of prior accidents at the site, or prior complaints about the lack of striping or shoulders or the steep slope into the shallow ditch, all of which were open and obvious conditions, both at the site and throughout the City. Thus, the City had no reason to target the accident site for improvements. Further, the trial court had supportable credibility concerns regarding the plaintiff and the gravity of the harm she actually suffered as a result of the subject accident. On the other hand, (3) the cost of preventing the low likelihood and questionable gravity of harm was great. The City's budget could not cover the cost of filling ditches and installing culverts throughout the city, and its policy was to provide such improvements only if the property owner requested them *and* agreed to share the cost by providing the materials, which was not the case at the accident site. Finally, Ms. Fuselier's travel on the road was for a (4) useful purpose, and there was no evidence of speeding or other dangerous activity.

Given the above factors, where utility was high, likelihood and gravity of harm were low, and the cost of preventing the harm was great, we cannot say that the trial court manifestly erred or was clearly wrong in finding no unreasonable risk of harm. The trial court provided an extensive nine-page

7

analysis of the issues, the factors she was called upon to balance, the evidence, and

her ultimate conclusions and reasons for judgment:

> Hospital Drive is in the custody and control of the City of Oakdale. It is a two-lane, paved roadway with no center striping. The paved portion of the roadway is between 20' and 21'4" in width. Although there was an overlay in 2003/2004, Hospital Drive had not been reconstructed prior to the Fuselier accident. This street is a high traffic street in Oakdale, Louisiana. At the point that Ms. Fuselier left the roadway, there was no shoulder or only a foreslope (slight sloping shoulder leading directly into the ditch) on the right side of the roadway. Adjacent to the roadway was a 2-2 ½' deep ditch with a 1:1 or a 1 ½ :1 slope that extended for about 50-53'. At the end of the ditch was a culvert under a 22' dirt/grass covered driveway, followed by a cross-ditch that was about 2 ½ ' deep and 6' from the roadway. Past the cross ditch was a short grassy area and then the curb of the cement driveway of the Allen Parish Health Unit parking lot. On the day of the accident, the weather was clear and the roadway was dry. At the site of the accident the roadway was straight with no visual obstructions. The speed limit on Hospital Drive was 30 mph.

> Robert Staehle was the public works superintendent for the City of Oakdale at the time of the accident. He has been in this position for 18 years. He verified that the City of Oakdale owned Hospital Drive. It was the City's responsibility to maintain its roadways. Hospital Drive was overlaid in 2003/2004. The City puts in culverts and covers ditches throughout the city for landowners when the landowners so request. The landowner pays for the materials and the city provides the equipment and the labor to install the culvert. The installation of a culvert requires the building of catch basins and sometimes the movement of sewer and utility lines. Under the ditch at the site of the Fuselier accident is the main sewer line that feeds the federal prison. At the site there is, also, a gravity manhole cover.

> Charles Powers, retired Oakdale police officer, stated that in the 17 years prior to the accident that he was an Oakdale police officer, he did not recall a complaint or an accident reported on Hospital Drive at the site of the Fuselier accident. Former mayor, Bobby Abrusley testified that for the 13 years that he was mayor prior to the Fuselier accident, the city received no

8

complaints about Hospital Drive where the Fuselier accident occurred nor were there any other accidents there. Mr. Staehle testified that in the 12 years that he was the public works superintendent for the city prior to this accident there were no complaints reported to him about the shoulders, ditches or center striping on Hospital Drive at the accident site. Additionally, he does not recall any other accidents at that site.

In the city of Oakdale, there are many roadways which have little or no shoulder, an adjacent ditch with a steep slope, and no center striping (as per testimony of Robert Staehle, Bobby Abrusely, Charles Powers, and Glen Turner). Glen Turner, an expert in the field of engineering for municipal projects which include road construction, reconstruction and overlay, and utility and sewer projects, testified that he was asked to do a cost estimate to upgrade the streets for the City of Oakdale. He was asked to utilize DOTD standards, although he does not believe that DOTD standards ordinarily apply to cities. For example DOTD standards call for paved shoulders which he does not believe would apply to cities. Mr. Turner utilized maps of all the streets in Oakdale as well as high resolution aerial photos and an on-site inspection of some streets to develop estimates for the cost of correcting roads with insufficient shoulders and slopes, adjacent ditches too close to the roadway with non-recoverable slopes, and no center striping. The estimate for the total cost would be $15.2 million, $12 million of which would be construction. Mr. Turner's estimate did not include the movement of utilities which would increase the cost significantly. It did include the cost of paving the shoulders. Leaving the shoulders unpaved would reduce his estimate by 20-25%. Mr. Turner's estimate would increase the slope of ditches to 3:1. From his prior work for the city, Mr. Turner testified that Oakdale is flat and drainage is critical to prevent flooding. The proper size and depth of culverts in a sewage system is vital to maintaining proper drainage. The cost for this study was included in the estimate for the total cost of the project.

Mr. Abrusley testified that during his tenure as mayor of Oakdale the budget was always tight. There are many, many streets in Oakdale with no shoulders and steep adjacent ditches. He believed that the cost to correct the shoulders and cover the ditches throughout the city would be $10-12 million which the city did not have. According to Mr. Abrusley and Mr. Staehle, the

culverts to the north of the Fuselier accident site were put in by the contractors of the property owners when they built their medical buildings, not by the city. There [h]as been no reconstruction of Hospital Drive since it was built.

Thus, local authorities all agreed that there were no prior accidents and no complaints regarding the condition of the road which would cause them to target the accident site for improvements. Additionally, without requests and funding by the property owners, the City could not afford to fix all such conditions throughout the City. The trial court next discussed the expert testimony:

> Duaine Evans, an expert in the field of traffic engineering and accident reconstruction, testified on behalf of Ms. Fuselier. He was asked to render an opinion on whether or not the condition of the roadway was a contributing factor of the accident. He believed that it was. At the site where the Fuselier vehicle left the roadway on Hospital Drive, there was no center striping, no shoulder and an adjacent 2 ½' ditch with a slope of 1:1. Mr. Evans testified that a 1:1 [slope] is non-recoverable. Once Ms. Fuselier's right tires left the roadway, her vehicle was pulled down into the ditch and rode the channel of the ditch. Mr. Evans testified that there was nothing that Ms. Fuselier could do to get back onto the roadway. Once she was off the roadway, it would have taken her 1 ½ seconds to react. By that time (the lapse of 1 ½ seconds) Ms. Fuselier would have already hit the culvert, jumped the cross ditch and come to a stop at the curb of the driveway to the Allen Parish Health Unit. All of this would have occurred before she could react to leaving the roadway.

> Mr. Evans believed that Ms. Fuselier acted reasonably by pulling to the right to avoid a head on collision. Mr. Evans did not believe that the cross ditch was at issue as a cause of the accident. He did not determine the cost to the city to fix the shoulder and the adjacent ditch at the accident site. He testified that there is no other area on Hospital Drive that is like the accident site. He stated that to the north there are covered culverts and to the south there are shoulders; however, Jeremy Hoffpauir, the city's expert, testified that he observed an area just to the north of the accident site where there was no shoulder with a 20' long, open, steep ditch adjacent to

10

it. Under cross examination Mr. Evans agreed with the City's expert that Ms. Fuselier would have entered the adjacent ditch no matter if the slope was 1:1, 2:1, or even 3:1 because there was no time for her to recover/react from leaving the roadway before her vehicle came to stop. Despite that, on redirect, Mr. Evans reiterated that without the ditch the accident would not have occurred.

. . . .

Mr. Hoffpauir is an expert in the field of accident reconstruction and testified for the City of Oakdale. Mr. Hoffpauir was asked by the city to render an opinion as to the cause of the accident. He believed that the primary cause of the accident was the other vehicle moving into Ms. Fuselier's lane of travel. A secondary cause would have been Ms. Fuselier's emergency maneuver to avoid an on-coming vehicle, but he does not attribute fault to her because it was an "emergency" created by the other vehicle.

Mr. Hoffpauir did not believe that the lack of center striping, the lack of shoulder nor the steep slope of the adjacent ditch were causes of the accident. The roadway was a wide roadway. At the point that she left her lane of travel it was 21'4" wide. According to Ms. Fuselier the other vehicle was either all the way in her lane of travel or almost all the way such that she thought there was going to be a head on collision in her lane of travel. Whatever lapse or inattention caused the "mystery" driver to leave his/her lane of travel to such a degree that a head on collision was imminent would not have been cured by center striping. Mr. Hoffpauir found that no shoulder and the 32-36 degree (or 1½ :2) slope of the ditch at the site of the accident were not optimum conditions for a roadway. However, Mr. Hoffpauir testified that even if there had been a 3-4' or even 5-6' shoulder and a 3:1 recoverable slope in the adjacent ditch, Ms. Fuselier would still have gone into the ditch with the same result because she still would not have had time to react to leaving the roadway before her vehicle came to a stop. He agreed with Mr. Evans that normal reaction time is 1½ seconds and by that time the accident was over.

The experts agreed that Ms. Fuselier, who was travelling 23-30 miles per hour, covered about forty-four feet of ground in the first second, and had gone

a total of sixty-six feet before she could react to what happened. By that time the accident was over. This theory of the reaction time is consistent with the absence of physical evidence that Ms. Fusilier applied her brakes or attempted to re-enter the roadway after leaving it. The trial court's assessment of the expert testimony led to her finding regarding causation.

In weighing the gravity of harm, the trial court detailed the medical evidence and other incidents which caused her to question Ms. Fuselier's credibility. The record reveals that Ms. Fuselier's orthopedist, Dr. David Delapp, related her injuries and ongoing chronic pain to the August 2006 accident, based upon the history she gave him. However, when he first saw Ms. Fuselier in August 2007, a year after the accident, her compression fracture at T-11 had healed. He found full range of motion on flexion-extension, some pain on side bending, 2+ deep tendon reflexes bilaterally, diminished sensation in the lower extremities, which he found questionable, and a negative straight leg raise. He recommended an MRI and referred her to Dr. William Dole for an EMG and pain management. He also recommended physical therapy. Eventually, Ms. Fuselier attended three sessions, then stopped. The August 2007 MRI indicated three thoracic disc bulges.

When Ms. Fuselier saw Dr. Dole in September 2007, he did not perform the EMG because she had no complaints of radiculopathy in her back. His physical exam showed normal range of motion and normal strength in the arms, legs, and muscles, and the straight leg-raise test was negative. When she saw him for pain management almost a year later, in August 2008, Dr. Dole performed a drug screen which was positive for Xanax, Valium, Cocaine, and Hydrocodone. After performing a physical exam, his impression was thoracic compression fracture, substance abuse and myofacial pain of the right scapula. He

12

recommended substance abuse treatment, prescribed non-narcotic pain medication, and released her because of the positive drug test. He thought she would continue to improve and could manage future pain with over-the-counter medicine. She subsequently spent nine months in drug rehabilitation and continued treatment on an outpatient basis into 2009.

When Dr. Delapp saw Ms. Fuselier in June 2009, she complained that her pain was worse and that it affected her sexual activity and daily living. However, she did not tell Dr. Delapp about the May 2009 domestic violence and sexual assault by her live-in boyfriend. She was beaten, thrown to the ground, and he hit her head on the floor several times, but she denied any injuries from the beating. Photographs indicate otherwise. In a 2011 protective order, Ms. Fuselier asserted numerous beatings by the boyfriend. In December 2009, she had a one-car accident, running into a bridge due to inattention; she was convicted of a DWI for this accident, which she explained was due to having taken pain medication for the subject accident. Ms. Fuselier said she had no injuries from this accident.

The trial court also stated that between the accident and trial, Ms. Fuselier had two more children, but had only shared custody of one of her four children; the other three were living elsewhere. Ms. Fuselier had also had kidney stones and other renal problems, an emotional breakdown, a slip and fall injury to her head requiring a visit to the ER, and continued treatment for pre-existing depression. She alleged no pre-accident injuries but had filed suit in Rapides Parish for injuries sustained in a 2001 car accident, which she did not remember filing when questioned at trial. In 2005, a year before the subject accident, Ms. Fuselier had a felony conviction for conspiracy to forge a prescription, a violation

13

of the controlled dangerous substance law. The trial court summarized her findings as follows:

> As a result of the accident Ms. Fuselier had a T11 compression fracture that is healed. It continues to cause her pain to date. Although none of the physicians who testified found that she was a malingerer, the court did have some credibility issues with Ms. Fuselier relative to her testimony as to her chronic pain. Ms. Fuselier was able to go back to work within two months and, to date, has treated her pain primarily with over the counter medications and heat. Her treating physician, Dr. Delapp, saw her the first time a year after the accident, then once in 2008 and twice in 2009. Ms. Fuselier did not see Dr. Delapp again until August 2012. She had no new complaints except for some spasms that Dr. Delapp said could be attributed to her being eight months pregnant. This last visit coincided with a trial fixing set for September, 2012. At his deposition Dr. Delapp was made aware of the May, 2009 domestic abuse event. He said that there was no acute evidence of injury from it in the 2009 MRI. However, he did not seem to be aware of the prior accident, the intervening accident, the other domestic abuse incidents or of her substance abuse problems (except for the positive drug screen at Dr. Dole's office). Ms. Fuselier has drug dependency issues. She has seen three different pain management specialists, none of whom would give her narcotic pain medication and only one of whom she saw more than one time. (She saw Dr. Dole twice). So, although the court finds that Ms. Fuselier had a T11 compression fracture which has healed, the court is uncertain about the severity and gravity of her chronic pain.
>
> . . . .
>
> Consequently, after balancing the gravity and risk of harm to Ms. Fuselier against the cost to the city of repairing this type of deviation throughout the city and the feasibility of said repairs, the court cannot say that the instant deviation is unreasonably dangerous.
>
> Furthermore, even if the court found that the condition of the roadway, shoulder and ditch created an unreasonable risk of harm to Ms. Fuselier, the court would not find that it was a cause-in-fact of the harm to Ms. Fuselier. A defendant's conduct is a cause-in-fact of the harm only if it is "substantial factor" in bringing

14

about the harm. *Graves*, [703 So.2d] at 570. The breach of duty by the defendant must be such that it denies Ms. Fuselier the opportunity to avoid an accident. Ms. Fuselier left the roadway because another vehicle was in her lane of travel. The roadway was 21'4" at the site of the accident, clearly wide enough for two vehicles.

It is clear that the trial court's choice was based on reasonable credibility evaluations and factual inferences in light of the entire record. The judge had supportable credibility concerns, as the record was replete with events calling into question the gravity of the harm allegedly caused by this single car accident. There were significant gaps in treatment, failures to follow up and follow through with recommended treatment, lack of objective symptoms at times, unreported accidents, repeated domestic violence, substance abuse, DUI, positive drug testing, felony conviction relative to prescription fraud, refusals by pain management physicians to treat Ms. Fuselier, confinement to rehabilitation, symptoms related to pregnancies rather than the accident, only six or eight weeks of missed work, and numerous job changes also not related to the accident.

In view of these facts regarding the questionable gravity of harm, the low likelihood of harm due to the open and obvious conditions and the absence of prior accidents or complaints, and the high cost to the City of adding culverts and shoulders throughout the city, we cannot find manifest error in the trial court's failure to find an unreasonable risk of harm. Accordingly, we need not further address the trial court's alternative ruling on cause-in-fact.

V.

## **CONCLUSION**

Based upon the foregoing, we affirm the judgment of the trial court.

Costs are assessed against Kelli Fuselier.

**AFFIRMED.**