STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-538


RICHARD AND PATRICIA PANNELL

VERSUS

THE CITY OF SCOTT, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20155973
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

**********

**GUY E. BRADBERRY**
**JUDGE**

**********

Court composed of Van H. Kyzar, Wilbur L. Stiles, and Guy E. Bradberry, Judges.


**AFFIRMED.**

**Jack Derrick Miller**
**415 North Parkerson Avenue**
**Crowley, LA 70527-1650**
**(337) 788-0768**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
**Richard Pannell**
**Patricia Pannell**

**Ian Alexander Macdonald**
**Jones Walker, LLP**
**600 Jefferson St, #1600**
**Lafayette, LA 70501**
**(337) 593-7617**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
**Louisiana Farm Bureau CasualtyInsurance Co.**
**Chase Franks**

**James A. Prather**
**Greg C. Fuxan**
**Galloway, Johnson, Tompkins, Burr & Smith, APLC**
**#3 Sanctuary Boulevard, 3rd Floor**
**Mandeville, LA 70471**
**(985) 674-6680**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Great Lakes Insurance SE**

**Anne Derbes Wittmann**
**Erin Pelleteri Howser**
**Baker Donelson Bearman Caldwell & Berkowitz, PC**
**201 St. Charles Avenue, Suite 3600**
**New Orleans, LA 70170**
**(504) 566-5200**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Bac Three, Inc.**

**BRADBERRY, Judge.**

Patricia and Richard Pannell appeal a jury verdict finding that the Defendants were not responsible for the death of their daughter and denying them damages. They allege the jury committed manifest error in its findings, in addition to other trial court errors. One of the Defendants, BAC Three, Inc., answered the appeal also asserting the jury committed manifest error in its findings. For the following reasons, we affirm the judgment of the trial court.

## FACTS

On the night of December 11, 2014, twenty-one-year-old Kylie Pannell went to Cowboys Nightclub in Scott with several friends. Cowboys was owned by BAC Three. On this particular night, a popular musician was playing, so the bar was crowded. Due to an ordinance, the club closed at 2:00 am on December 12. At that time, the people remaining in the bar began leaving and heading to the parking lot. According to the witnesses, the vehicles began exiting the parking lot at the same time, mostly using the same exit heading toward Ambassador Caffery Parkway. The vehicles moved slowly in a stop-and-go fashion, allowing other parked vehicles into the travel lane as they proceeded toward the exit.

Chase Franks also visited Cowboys that same evening. As Chase attempted to leave in his truck after Cowboys closed, he believed another truck was allowing him into the exit lane, so he let his foot off the brake and began moving forward. Chase turned his wheel to the left to enter the exiting lane and suddenly saw a silhouette on the front left portion of his truck and slammed on his brakes. The figure was Kylie, who slammed onto the hood of his truck, bounced off, and fell onto the ground. Chase testified that this all happened in milliseconds.

Chase went to check on Kylie, and she was not responding. He then went to look for the police officers to report what happened and found them in the back parking lot. He went back to his truck.

An ambulance arrived very quickly and transported Kylie to a hospital, where she tragically died. At the time of her death, Kylie's parents were living in North Carolina. Kylie was supposed to travel there the next day to see her parents. A doctor called Kylie's parents that morning informing them that their daughter had died.

The Pannells filed suit on December 12, 2015. By the time the case proceeded to trial, the remaining Defendants were BAC Three, and its insurer, Great Lakes Insurance SE, in addition to Chase Franks and his insurer, Louisiana Farm Bureau Casualty Insurance Company. The Pannells claimed that BAC Three was liable for the accident due to the unreasonable conditions created in its parking lot for its failure to implement signage, striping, appropriate lighting, or traffic personnel. The Pannells claimed that Chase was liable based on his intoxication and failure to yield to a pedestrian.

Trial before a jury took place over four days from July 26, 2021, to July 29, 2021. The jury entered a final verdict finding that Chase was not at fault for the accident. The jury did find that the condition of Cowboys' parking lot created an unreasonable risk of harm for the accident but that it was not a substantial factor contributing to the accident. Therefore, the Pannells were not awarded any damages.

The Pannells appealed the trial court judgment asserting several assignments of error. They claim the jury erred in its finding that the parking lot was not a substantial factor in causing the death of Kylie and that the jury did not understand

what "substantial factor" meant. The Pannells also allege that the trial judge erred in allowing a deposition into evidence. They did not appeal the finding that Chase was not liable. BAC Three answered the appeal, also asserting error with the jury verdict finding that its parking lot created an unreasonable risk of harm and that the trial court erred in denying its motion for directed verdict regarding the Panells' survival action claim.

## ADMISSION OF DEPOSITION

We first address the Panells' argument that the trial court erred in admitting the deposition testimony of Paizlee Fabian. An erroneous admission of a deposition is legal error that interdicts the fact-finding process and presents a question of law that is no longer subject to the manifest error standard of review. *Rodriguez-Zaldivar v. Leggett*, 21-478 (La.App. 4 Cir. 9/28/22), ___ So.3d ___.

The Pannells contend that there was never an agreement regarding introduction of Paizlee's deposition in lieu of her testimony at trial. They argue that she was not proven unavailable as required by La.Code Civ.P. art. 1450. The Pannells claim that a statement by counsel for BAC Three that Paizlee was unavailable to testify is insufficient proof as it is hearsay evidence. BAC Three argues that the Pannells never objected to the use of the deposition at trial, but merely objected to references in the deposition about Kylie's sexual orientation.

In the present case, BAC Three initially listed Paizlee as a witness on its witness list as living in Round Rock, Texas, which is greater than 100 miles from Lafayette. In an amended witness list filed on May 21, 2021, BAC Three listed Paizlee as a witness by deposition. Letters were exchanged between both parties, with counsel for the Pannells submitting portions of the deposition he agreed could be used as testimony and the portions he opposed. He also stated that, "by my

3

providing these additions and objections does not indicate that I do not have any other objection to the deposition, itself, being introduced. I am reserving my right to do so."

Prior to trial, the Pannells filed a motion in limine to exclude certain evidence, including "[a]ny reference to the sexual orientation of Kylie Pannell, both prior to and the time of the injuries and death on Cowboys['] parking lot." No mention was made of the deposition itself. A hearing was held on the motion in limine, and judgment was rendered, ordering in part:

> Counsel for defendants shall submit page and line designations for the deposition testimony of Paizlee Fabian they intend to proffer at trial of this matter. If Plaintiffs object to any of the proffered testimony, the Court will rule on any such objections upon submission to the Court.

At the beginning of trial, counsel for BAC Three noted that there was an issue relating to four lines of testimony in Paizlee's deposition and that the deposition would be introduced to the jury by way of deposition transcripts. The disputed testimony was reviewed with the trial judge but no objection to the deposition itself was made.

However, prior to the introduction at trial, counsel for the Pannells specifically objected to its introduction, arguing that counsel suggesting that Paizlee living in Texas is not sufficient to prove absenteeism. Counsel for BAC Three argued that they let Pannells' counsel know a year before trial they intended to introduce the deposition testimony, and since that time, correspondence was exchanged regarding designations and objections to certain testimony to be omitted at trial. The trial court overruled the objection and allowed the introduction of the redacted deposition.

4

On appeal, the Pannells argue that there was no evidence that Paizlee was not available to testify or that she lived 100 miles from Lafayette. They further argue that counsel for BAC Three's argument that Paizlee was unavailable to testify is hearsay evidence and not proper evidence which would support introduction of the deposition.

Louisiana Code of Civil Procedure Article 1450(3) provides for the use of deposition testimony when a witness is unavailable as follows:

> The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
>
> (a) That the witness is unavailable;
>
> (b) That the witness resides at a distance greater than one hundred miles from the place of trial or hearing or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or
>
> (c) Upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

Regarding the admissibility of a deposition at trial by the trial court and this court's review of the trial court's ruling, the fourth circuit stated:

> "A ruling on the admissibility of evidence is a question of law and is not subject to the manifest error standard of review." *Trascher v. Territo*, 11-2093, p. 4 (La. 5/8/12), 89 So.3d 357, 362 (citing Frank L. Maraist, *Louisiana Civil Law Treatise: Evidence and Proof*, Vol. 19, § 2.10, p. 36). "A party may not complain on appeal about an evidentiary ruling in the trial court unless the trial judge was given the opportunity to avoid the perceived error, and the ruling 'affected' a 'substantial right' of the party." *Id*. (quoting *Maraist, supra*, and citing La. C.E. art. 103(A)(1)). "The trial court has much discretion in determining whether to allow the use of deposition testimony at trial, and its decision will not be disturbed upon review in the absence of an abuse of that discretion." *Boutte v. ABC Ins. Companies*, 00-0649, p. 8 (La. App. 4 Cir. 2/6/02), 811 So.2d 30, 35 (citation omitted).

*Rodriguez-Zaldivar*, ___ So.3d at ___.

"'When the deposition is sought to be used in place of the witness' actual trial testimony, a showing of unavailability of the witness is required.'" *Id*. at ___ (quoting *Cawthorne v. Fogleman*, 12-870, p. 6 (La.App. 3 Cir. 2/6/13), 107 So.3d 906, 911, *writ denied*, 13-501 (La. 4/12/13), 111 So.3d 1011). "'[H]earsay evidence may not be considered in the judicial inquiry of a witness' unavailability.'" *Id*. (quoting *Bourgeois v. A.P. Green Indus. Inc.*, 06-87, p. 20 (La.App. 5 Cir. 7/28/06), 939 So.2d 478, 493, *writ denied*, 06-2159 (La. 12/8/06), 943 So.2d 1095).

In *Rodriquez-Zaldivar*, ___ So.3d ___, the fourth circuit noted that the plaintiffs, who were seeking to introduce their own deposition testimony in lieu of trial testimony, relied on cases in which courts allowed evidence of attorneys' statements based on their own personal knowledge of unavailability or documentary evidence of the witness's noncompliance with a subpoena. The fourth circuit found that neither of these factors was present and that there was no competent evidence demonstrating that the plaintiffs were unavailable for their own trial.

In *Ball v. Capital City Cornichon Corp.*, 11-1862 (La.App. 1 Cir. 5/2/12) (unpublished opinion), *writ denied*, 12-1448 (La. 1/18/13), 107 So.3d 623, the trial court allowed the statement of an attorney that a witness was unavailable to suffice for introduction of the testimony. In *Dunning v. Dapco Ventures, L.L.C*, 01-2366 (La.App. 1 Cir. 11/8/02), 834 So.2d 448, *writ denied*, 03-215 (La. 3/28/03), 840 So.2d 576, the trial court also allowed the use of deposition testimony of a witness when an attorney stated that he was unable to subpoena the witness to testify at trial. The court in *Snell v. United Parcel Services, Inc.*, 543 So.2d 52 (La.App. 1 Cir.), *writ denied*, 545 So.2d 1040 (La.1989), allowed the use

6

of deposition testimony when defense counsel stated that efforts to subpoena the witness were futile. The decisions of those trial courts were all upheld on appeal.

The Pannells were put on notice that Paizlee was listed as living in Round Rock, Texas on the witness list and that her deposition would be used in lieu of her live testimony. We also note that both parties had the opportunity to examine Paizlee during her deposition. Furthermore, prior to trial, counsel for BAC Three and the Pannells exchanged letters as to what testimony in the deposition should be omitted, with objections to certain testimony continuing prior to trial. Also, Bac Three's counsel did confirm on the day of trial that Paizlee was living in Texas and unavailable. Under these circumstances, we find no abuse of discretion in the trial court's decision finding Paizlee was unavailable since she lived greater than 100 miles from the Lafayette area, and allowing the use of Paizlee's deposition testimony in lieu of live testimony.

### UNREASONABLE RISK OF HARM

BAC Three answered the appeal asserting its own assignments of error regarding the issue of unreasonable risk of harm. It first argues that the trial court erred in denying its motion for directed verdict that the Pannells failed to establish it had a duty to implement signage, striping, or traffic personnel in the Cowboys' parking lot and permitting testimony regarding the absence of such features. It further argues that even if we find that the trial court did not err in granting the motion for directed verdict, the jury erred in finding that the parking lot created an unreasonable risk of harm.

### Directed Verdict

A trial judge has much discretion in deciding whether to grant a motion for directed verdict, which should only be granted when overwhelming evidence

clearly points to one conclusion. *Fontenot v. UV Ins. Risk Retention Grp., Inc.*, 20-361 (La.App. 3 Cir. 4/14/21), ___ So.3d ___, *writ denied*, 21-656 (La. 10/5/21), 325 So.3d 357. On appeal, the standard of review for a directed verdict is de novo. *Id.*

> A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict.
>
> However, if there is substantial evidence opposed to the motion, *i.e.*, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury.

*Wright v. Bennett*, 04-1944, p. 15 (La.App. 1 Cir. 9/28/05), 924 So.2d 178, 187 (citations omitted).

To establish tort liability under a negligence theory, a plaintiff is required to establish:

> (1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached.

*Doe v. McKesson*, 21-929, p. 7 (La. 3/25/22), 339 So.3d 524, 531. "Whether a defendant owes a plaintiff a duty is a question of law." *Id.*; *Smith v. State through Dep't of Transp. and Dev.*, 21-192 (La.App. 3 Cir. 3/3/22), 350 So.3d 879.

> In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. The court may consider various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving.

8

*Posecai v. Wal-Mart Stores, Inc.*, 99-1222, pp. 4-5 (La. 11/30/99), 752 So.2d 762, 766 (citations omitted).

Premises liability under Louisiana law is provided for in La.Civ.Code art. 2317.1, which provides that "[t]he owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect . . . [which] could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care."

While we have found no law, and none has been cited to us, that provides the owner of a private parking lot owes a duty to have striping, signage, and lighting in a parking lot, there was evidence that the overall situation in the parking lot that night might be considered dangerous. Even if no duty existed, we agree that testimony was appropriate to establish the conditions of the parking lot on the night of Kylie's death. No one testified that Cowboys was required to have any of signage, extra lighting, or traffic personnel. The testimony simply provided insight as to the conditions in the parking lot.

The Pannells presented evidence that Cowboys' parking lot was very crowded that particular night because a popular singer was performing. The parking lot was also very dark, as there was only one light in a far corner in addition to a light in front of the entrance to the bar. The parking lot was packed at 2:00 a.m. when the bar closed, and everyone started leaving at the same time. Police officers were hired by Cowboys to deal with fights and other similar incidences but were not there to direct traffic.

While there was no evidence presented that Cowboys was required to have signage, striping, or traffic personnel, the Pannells did present evidence which would permit a jury to find that Cowboys had a duty under La.Civ.Code art.

9

2317.1 to better control conditions in its parking lot on busy nights. The trial court did not err in refusing to grant BAC Three's motion for directed verdict.

**Jury's Determination**

BAC Three argues the risk created by the exiting line of vehicles was obvious and apparent, so that the jury erred in finding that the parking lot created an unreasonable risk of harm.

The determination of whether a defect presents an unreasonable risk of harm for premises liability purposes is a mixed question of law and fact which must be determined considering the facts and circumstances of each particular case by the trier of facts. *Broussard v. State ex rel. Office of State Bldgs.*, 12-1238 (La. 4/5/13), 113 So.3d 175. The finding of whether a condition presents an unreasonable risk of harm is subject to the manifest error standard of review. *Id.*

In deciding whether a condition presents an unreasonable risk of harm, a risk-utility balancing test is utilized by the fact finder, who considers:

> (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature.

*Id.* at 184.

"[A] defendant generally does not have a duty to protect against an open and obvious hazard." *Id.* Furthermore, it is a pedestrian's duty to see which should have been seen and to insure the pathway is clear. *Grossie v. MGM Props., Inc.*, 18-224 (La.App. 3 Cir. 4/10/19), 269 So.3d 921.

Several of the officers who provided off-duty security for the parking lot at Cowboys on the night of the accident testified at trial. Lieutenant Brun Lavergne testified that he has seen accidents between vehicles occur in the parking lot on

10

previous occasions. He explained that most of the time it involved a vehicle hitting a parked vehicle. He also observed people running through the parking lot, but not often.

Kyle Folse, who was no longer with the Scott Police Department at the time of trial, agreed that he has seen accidents involving vehicles and observed people running through the parking lot. He also has observed the situation in the parking to be chaotic at times.

Another officer, Hayden Godeaux, was the shift supervisor at the time of the accident, so he arrived at Cowboys later in the evening to help with security. He explained that there was not much lighting in the parking lot other than the headlights of the cars. He also stated that people would walk in between cars and in front of cars as they were leaving. He, too, had seen accidents involving vehicles colliding with each other and agreed that the parking lot is chaotic.

Based on this evidence, we find no manifest error in the jury's determination that the parking lot at Cowboys presented an unreasonable risk of harm. While it was obvious that the situation in the parking lot was open and obvious to those in it, creating an unreasonable risk of harm, there were additional conditions that were not open and obvious. The jury could have decided that Cowboys should have taken precautions to lessen the chaos, such as hiring personnel to direct the exiting vehicles and perhaps, adding additional lighting.

## SUBSTANTIAL FACTOR

The Pannells argue that the jury committed manifest error in its determination that the condition of Cowboys' parking lot was not a substantial factor resulting in Kylie's death after it found that the parking lot created an unreasonable risk of harm. The jury was asked on the verdict form (emphasis

11

added): "Do you find that the condition of Cowboys' parking [lot] **caused or was a substantial factor** for the accident on December 12, 2014[,]" to which the jury replied, "No."

In *Cole v. State ex rel. Department of Transportation and Development*, 99-912, p. 12 (La.App. 3 Cir. 12/22/99), 755 So.2d 315, 324-25 (alterations in original), *writ denied*, 00-199 (La. 4/7/00), 759 So.2d 766, this court discussed the history and burden under the substantial factor test:

> One must consider whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm. *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471 (La.1978). This is the substantial factor test which was developed in *Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co.*, 242 La. 471, 481, 137 So.2d 298, 302 (1962) where the court concluded "negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm…[t]he negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it."

If the injury would have occurred regardless of a party's negligent conduct, then the negligent conduct is not a substantial factor in causing the injury. *Trahan v. McManus*, 96-669 (La.App. 3 Cir. 2/19/97), 689 So.2d 696, *reversed on other grounds*, 97-1224 (La. 3/2/99), 728 So.2d 1273.

The supreme court further explained the substantial factor test in *Perkins v. Entergy Corp.*, 00-1372, 00-1387, 00-1440 (La. 3/23/01), 782 So.2d 606, stating that the substantial factor test applies when there are multiple causes and the plaintiff's injuries would not have occurred absent the defendant's conduct. The trier of fact "'must consider whether the [defendant's] conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm.'" *Id*. at 612 (quoting *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 475 (La.1978)).

In order "[t]o satisfy the substantial factor test, the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was a substantial factor bringing about the complained of harm." *Id.* "Whether the defendant's conduct was a substantial factor in bringing about the harm, and, thus, a cause-in-fact of the injuries, is a factual question to be determined by the [fact finder]." *Id.*

> In order to reverse a trial court's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Further, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.

*Id.* (citation omitted).

Prior to trial, counsel for the parties entered stipulations that Kylie was a regular patron at Cowboys and that she was familiar with layout of the parking lot. It was also stipulated that on previous occasions, she drove into Cowboys' parking lot and exited the parking lot. On the night of the accident, Kylie was also wearing an all-black outfit.

In her deposition testimony, Paizlee Fabian testified that she met Kylie in 2012 through mutual friends. Eventually, she and Kylie developed a closer relationship and began seeing each other. Kylie told Paizlee that she was thinking about moving to North Carolina where her parents now lived.

The night of the accident, Paizlee, Kylie, and two other friends went to Cowboys together. Paizlee testified that she was ready to leave at 1:30 a.m. because Kylie was flirting with another girl, so she told Kylie she would see her at home. Paizlee then called friends to come pick her up. She left, got in a friend's car, and started to drive off. Paizlee stated Kylie followed her and told Paizlee that

she was coming with her. Kylie got in the car and sat next to Paizlee. The two then began arguing about the other girl. Paizlee called another friend, told Kylie she would see her at home, and got in the other friend's car. Paizlee was in the car a few minutes when she received a phone call that Kylie was hit by a vehicle.

The jury heard testimony from Dylan Thomas, who was at Cowboys that night and attempting to exit the parking lot when it closed. Mr. Thomas had been to Cowboys on several occasions. When he arrived, he did not need assistance telling him where to park. Dylan testified that the customers know where the travel lanes were and where to park. He did not drink any alcohol that night because he was the designated driver. At closing he went to the parking lot and did not notice anything different about the way cars were exiting that night than on previous occasions. He pulled into the single line of vehicles leaving the parking lot, which were not going any faster than five miles per hour. Dylan explained that traffic was stop and go as vehicles were letting cars in and people cross in front.

Dylan noticed Kylie running across the parking lot from the right side. He explained that she was at a full sprint, running at an angle. He had to lock his brakes to stop his truck to avoid hitting her. She was about three to four feet from his vehicle when he braked. He testified that Kylie did not stop running even after he slammed on his brakes. Kylie did not break stride and ran straight into Chase's truck. Dylan stated he had never seen anybody run like that in the parking lot.

Dylan further testified that when he stopped to avoid hitting Kylie, Chase Franks thought he was letting him into the exiting line of vehicles. Chase's truck was about five to six feet from Dylan's truck. Dylan stated that Kylie did not break stride and ran straight into Chase's truck. When Chase pulled out, his

14

vehicle collided with Kylie. Kylie's head hit the hood of Chase's truck, and she fell backwards.

Chase testified that he too had been to Cowboys on many occasions. He got to Cowboys around 9:30 p.m. He stated that parking at Cowboys was pretty much the same every night. He needed no help deciding where to park and did not need help getting out of the parking lot. He originally tried to leave around midnight because he had to go to work the next day, but another vehicle parked behind him and blocked him. Chase sought out the help of Lieutenant Lavergne, who had been hired by Cowboys as off-duty security for the parking lot. Typically, two officers would provide security early in the night and later were joined by an additional two officers. The officers were not hired to direct traffic.

Lieutenant Lavergne informed Chase that a tow company was towing vehicles, but he would have to wait because there were other vehicles already in line to be towed before they got to the one blocking him in. Chase then went back into Cowboys to wait. Chase testified that he drank four beers earlier in the night but did not drink any more alcohol after he went back in Cowboys. He stayed until the bar closed at 2:00 a.m. When he went back to the parking lot, the vehicle blocking his truck was still there, but the vehicle in front of him was gone.

Chase explained that he had a friend with him and had to wait for the friend to get in the truck before he could leave. Chase also testified that the vehicles were leaving in a stop-and-go pattern and traveling around five miles per hour. He turned his headlights on and started to proceed forward. Chase began creeping his vehicle forward to get into the exiting line and checked right and left. He said no one was driving crazy through the parking lot, but he did observe people running through the parking lot. He thought the truck in front of him stopped to let him in,

15

so he let his foot off the brake and proceeded about four to five feet and began to turn left, and within milliseconds, Kylie was in front of him on the left side of his truck. She struck his truck and fell backwards. He stated he did not even have time to see if she was running.

Lieutenant Lavergne administered a field sobriety test to Chase, which indicated he was intoxicated. A subsequent breathalyzer test confirmed that result.

Testimony revealed that patrons at Cowboys had been parking and exiting in the same manner for thirty years with no accidents involving pedestrians. Lieutenant Lavergne testified that for the most part, it was an orderly process of vehicles leaving the parking lot at closing time.

The trial court gave the following instruction to the jury regarding the substantial factor test:

> You will have to decide whether the plaintiffs' daughter would have suffered injury if the defendants had not done what they did. If, more likely than not, the plaintiffs' daughter **would** have suffered injury no matter what the defendants did or did not do, then you should decide that the injury was not caused by the defendants, and render a verdict for the defendants. If, on the other hand, the plaintiffs' daughter more likely than not **would not** have suffered injury but for what the defendants did or did not do, then you should decide that the defendants' conduct did play a part in the plaintiff's injury and you should proceed to the next part of the plaintiffs' case.

*Gaspard v Safeway Insurance Company*, 14-1676 (La.App. 1 Cir. 6/5/15), 174 So.3d 692, *writ denied*, 15-1588 (La. 10/23/15), 184 So.3d 18, involved an accident in a Winn-Dixie store parking lot. Parents carrying their minor child in a baby seat were struck by a vehicle while walking through a marked pedestrian zone in front of the store. The plaintiffs claimed that the trial court erred in granting summary judgment in favor of Winn-Dixie, claiming that improper striping and the lack of a stop sign contributed to the accident. Plaintiffs

16

introduced the deposition testimony of an expert who recognized that the Department of Transportation manual would not apply on a private parking lot, but stated that general safety standards in the Department of Transportation manual were violated and contributed to the accident. The first circuit held that even if the safety standards applied to Winn-Dixie, 'there was no factual support to establish that the design or maintenance of the parking lot had anything to do with the accident." *Id*. at 695.

In *Askins v. Barbazon*, 593 So.2d 792 (La.App. 4 Cir. 1992), the plaintiff sued for injuries he sustained when he was walking along a roadway within the Fairgrounds racetrack facility in New Orleans and was struck from the rear by a truck. The roadway was used regularly by pedestrians as a means of access to both the parking lot and the clubhouse. The jury found that the condition of the Fairgrounds did create an unreasonable risk of harm, but the condition was not a cause in fact of the accident. The first circuit held that even if there was merit to the plaintiff's argument that the area where the accident occurred created an unreasonable risk of harm, it was not the cause of the accident. The court held that the evidence supported the jury's conclusion that a drunk driver who lost control of his vehicle was the sole cause of the accident.

In *Adams v. Travelers Insurance Company*, 589 So.2d 605 (La.App. 2 Cir. 1991), a pedestrian was struck by a car as she walked across a parking lot of a shopping center and later died from her injuries. The shopping center was granted a directed verdict finding that there was no breach of duty in the parking lot design, or in the maintenance of the parking lot. The plaintiffs introduced the testimony of an expert who maintained that the parking lot was flawed in its design. The second

circuit held that the design of the parking lot played no part in the accident. The court specifically held that:

> No number of warning signs would have had any effect under the circumstances of this case. Furthermore, it is purely speculati[on] to assume that a raised pedestrian walkway would have prevented the accident because there is no indication of whether or how Mrs. Adams would have utilized this measure if it had been available.
>
> The evidence demonstrates that Mrs. Adams' tragic death was the result of a freak accident caused solely by Ms. Johnson's negligence. Although the parking lot might have been safer if it had the features suggested by Mr. Canfield, the plaintiffs failed to prove that the parking lot was unreasonably dangerous without those features or that its condition caused the accident.

*Id.* at 609.

Just as in the above cases, we find that there was sufficient evidence presented to the jury that the sole substantial factor that caused this accident was Kylie's inattentiveness while running through a crowded parking lot as vehicles were exiting. Kylie even failed to stop when she was almost hit by Dylan. She continued running and ran into the truck driven by Chase. The jury also found that Chase, who was intoxicated at the time of the accident, was not a substantial factor in causing the accident. This finding by the jury has not been appealed by the Pannells. We find no manifest error in the jury's finding that the accident was not caused by the condition of Cowboys' parking lot.

**JURY CONFUSION**

The Pannells also argue that the jury was confused as to the meaning of "substantial factor" on the jury verdict form. All parties agreed that there was an error in the first jury verdict form submitted to the jury and further agreed to submit a corrected form to the jury. The first form permitted the jury to continue answering additional questions involving Kylie's fault, percentages of fault of the

18

parties, and damages. The corrected form informed the jury that it did not need to continue answering the verdict form if it found that Chase was not at fault and that the condition of Cowboys' parking did not cause or was not a substantial factor for the accident. No objection was made by the Pannells to either jury form as required by La.Code Civ.P. art. 1793. The Pannells argue that the jury's finding that the condition of Cowboys' parking lot created an unreasonable risk of harm required them to find that the parking lot was a substantial factor for the accident, and that the jury was confused as to what "substantial factor" meant.

As previously stated, the jury was informed that it must determine that "[i]f, more likely than not, the plaintiffs' daughter **would** have suffered injury no matter what the defendants did or did not do, then you should decide that the injury was not caused by the defendants, and render a verdict for the defendants." The fifth circuit addressed a similar issue holding that "a finding of negligence does not necessitate a finding of causation." *Vince v. Koontz*, 16-521, p. 12 (La.App. 5 Cir. 2/8/17), 213 So.3d 448, 457-58, *writ denied*, 17-429 (La. 4/24/17), 221 So.3d 67. In addressing the plaintiffs' argument that a finding of negligence necessitated a finding of causation, the fifth circuit explained: "one, it ignores the fact that a negligence claim is comprised of five separate elements; and two, it ignores the prospect that the causal connection between a plaintiff's injuries and a defendant's negligence may be severed by intervening and superseding causes." *Id*. at 457.

We find no evidence in the record establishing that the jury was confused in answering the second verdict form. The jury received instructions on answering the verdict form and answered the form as instructed. The Pannells agreed with new verdict form, and even though they did not object to the form, they have not

19

indicated any problems with the new form, nor do we find any.  This assignment of error lacks merit.

Based on the above rulings, it is not necessary for us to address BAC Three's assignment of error regarding survival damages.

For the above reasons, the judgment of the trial court is affirmed.  Costs of this appeal are assessed equally between the Appellants, Patricia and Richard Pannell, and Appellee, BAC Three.

**AFFIRMED.**